# DOYLE v. OHIO

No. 75–5014.  Argued February 23, 1976—Decided June 17, 1976*

Powell, J., delivered the opinion of the Court, in which Burger, C. J., and Brennan, Stewart, White, and Marshall, JJ., joined. Stevens, J., filed a dissenting opinion, in which Blackmun and Rehnquist, JJ., joined, *post*, p. 620.

*James R. Willis* argued the cause for petitioners and filed briefs in both cases.

*Ronald L. Collins* argued the cause *pro hac vice* and filed a brief for respondent in both cases.†

---

*Together with No. 75–5015, *Wood* v. *Ohio,* also on certiorari to the same court.

†*Solicitor General Bork* filed a brief for the United States as *amicus curiae.*

Mr. Justice Powell delivered the opinion of the Court.

The question in these consolidated cases is whether a state prosecutor may seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving *Miranda* warnings [1] at the time of his arrest. We conclude that use of the defendant's post-arrest silence in this manner violates due process, and therefore reverse the convictions of both petitioners.

## I

Petitioners Doyle and Wood were arrested together and charged with selling 10 pounds of marihuana to a local narcotics bureau informant. They were convicted in the Common Pleas Court of Tuscarawas County, Ohio, in separate trials held about one week apart. The evidence at their trials was identical in all material respects.

The State's witnesses sketched a picture of a routine marihuana transaction. William Bonnell, a well-known "street person" with a long criminal record, offered to assist the local narcotics investigation unit in setting up drug "pushers" in return for support in his efforts to receive lenient treatment in his latest legal problems. The narcotics agents agreed. A short time later, Bonnell advised the unit that he had arranged a "buy" of 10 pounds of marihuana and needed $1,750 to pay for it. Since the banks were closed and time was short, the agents were able to collect only $1,320. Bonnell took this money and left for the rendezvous, under surveillance by four narcotics agents in two cars. As planned, he met petitioners in a bar in Dover, Ohio. From there, he and petitioner Wood drove in Bonnell's

---

[1] *Miranda* v. *Arizona,* 384 U. S. 436, 467–473 (1966).

pickup truck to the nearby town of New Philadelphia, Ohio, while petitioner Doyle drove off to obtain the marihuana and then meet them at a prearranged location in New Philadelphia. The narcotics agents followed the Bonnell truck. When Doyle arrived at Bonnell's waiting truck in New Philadelphia, the two vehicles proceeded to a parking lot where the transaction took place. Bonnell left in his truck, and Doyle and Wood departed in Doyle's car. They quickly discovered that they had been paid $430 less than the agreed-upon price, and began circling the neighborhood looking for Bonnell. They were stopped within minutes by New Philadelphia police acting on radioed instructions from the narcotics agents. One of those agents, Kenneth Beamer, arrived on the scene promptly, arrested petitioners, and gave them *Miranda* warnings. A search of the car, authorized by warrant, uncovered the $1,320.

At both trials, defense counsel's cross-examination of the participating narcotics agents was aimed primarily at establishing that, due to a limited view of the parking lot, none of them had seen the actual transaction but had seen only Bonnell standing next to Doyle's car with a package under his arm, presumably after the transaction.[2] Each petitioner took the stand at his trial and admitted practically everything about the State's case except the most crucial point: who was

---

[2] Defense counsel's efforts were not totally successful. One of the four narcotics agents testified at both trials that he had seen the package passed through the window of Doyle's car to Bonnell. In an effort to impeach that testimony, defense counsel played a tape of the preliminary hearing at which the same agent had testified only to seeing the package under Bonnell's arm. The agent did not retract his trial testimony, and both he and the prosecutor explained the apparent inconsistency by noting that the examination at the preliminary hearing had not focused upon whether anyone had seen the package pass to Bonnell.

selling marihuana to whom. According to petitioners, Bonnell had framed them. The arrangement had been for Bonnell to sell Doyle 10 pounds of marihuana. Doyle had left the Dover bar for the purpose of borrowing the necessary money, but while driving by himself had decided that he only wanted one or two pounds instead of the agreed-upon 10 pounds. When Bonnell reached Doyle's car in the New Philadelphia parking lot, with the marihuana under his arm, Doyle tried to explain his change of mind. Bonnell grew angry, threw the $1,320 into Doyle's car, and took all 10 pounds of the marihuana back to his truck. The ensuing chase was the effort of Wood and Doyle to catch Bonnell to find out what the $1,320 was all about.

Petitioners' explanation of the events presented some difficulty for the prosecution, as it was not entirely implausible and there was little if any direct evidence to contradict it.[3] As part of a wide-ranging cross-examination for impeachment purposes, and in an effort to undercut the explanation, the prosecutor asked each petitioner at his respective trial why he had not told the frameup story to Agent Beamer when he arrested petitioners. In the first trial, that of petitioner Wood, the following colloquy occurred:[4]

"Q. [By the prosecutor.] Mr. Beamer did arrive on the scene?

"A. [By Wood.] Yes, he did.

"Q. And I assume you told him all about what happened to you?

.       .       .       .       .

"A. No.

---

[3] See n. 2, *supra*.

[4] Trial transcript in *Ohio* v. *Wood*, No. 10657, Common Pleas Court, Tuscarawas County, Ohio (hereafter Wood Tr.), 465–470.

"Q. You didn't tell Mr. Beamer?

"A. No.

"Q. You didn't tell Mr. Beamer this guy put $1,300 in your car?

"A. No, sir.

"Q. And we can't understand any reason why anyone would put money in your car and you were chasing him around town and trying to give it back?

"A. I didn't understand that.

"Q. You mean you didn't tell him that?

"A. Tell him what?

"Q. Mr. Wood, if that is all you had to do with this and you are innocent, when Mr. Beamer arrived on the scene why didn't you tell him?

"Q. But in any event you didn't bother to tell Mr. Beamer anything about this?

"A. No, sir."

Defense counsel's timely objections to the above questions of the prosecutor were overruled. The cross-examination of petitioner Doyle at his trial contained a similar exchange, and again defense counsel's timely objections were overruled.[5]

---

[5] Trial transcript in *Ohio* v. *Doyle*, No. 10656, Common Pleas Court, Tuscarawas County, Ohio (hereafter Doyle Tr.), 504–507:

"Q. [By the prosecutor.] . . . You are innocent?

"A. [By Doyle.] I am innocent. Yes Sir.

"Q. That's why you told the police department and Kenneth Beamer when they arrived—

Each petitioner appealed to the Court of Appeals, Fifth District, Tuscarawas County, alleging, *inter alia,* that the trial court erred in allowing the prosecutor to cross-examine the petitioner at his trial about his post-arrest silence. The Court of Appeals affirmed the convictions, stating as to the contentions about the post-arrest silence:

> "This was not evidence offered by the state in its case in chief as confession by silence or as substantive evidence of guilt but rather cross examination

"A. . . . I didn't tell them about my innocence. No.

"Q. You said nothing at all about how you had been set up?

"Q. Did Mr. Wood?

"A. Not that I recall, Sir.

"Q. As a matter of fact, if I recall your testimony correctly, you said instead of protesting your innocence, as you do today, you said in response to a question of Mr. Beamer,—'I don't know what you are talking about.'

"A. I believe what I said,—'What's this all about?' If I remember, that's the only thing I said.

"A. I was questioning, you know, what it was about. That's what I didn't know. I knew that I was trying to buy, which was wrong, but I didn't know what was going on. I didn't know that Bill Bonnell was trying to frame me, or what-have-you.

"Q. All right,—But you didn't protest your innocence at that time?

"A. Not until I knew what was going on."

In addition, the court in both trials permitted the prosecutor, over more objections, to argue petitioners' post-arrest silence to the jury. Closing Argument of Prosecutor 13–14, supplementing Wood Tr.; Doyle Tr. 515, 526.

of a witness as to why he had not told the same story earlier at his first opportunity.

"We find no error in this. It goes to credibility of the witness."

The Supreme Court of Ohio denied further review. We granted certiorari to decide whether impeachment use of a defendant's post-arrest silence violates any provision of the Constitution,[6] a question left open last Term in *United States* v. *Hale,* 422 U. S. 171 (1975), and on which the Federal Courts of Appeals are in conflict. See *id.,* at 173 n. 2.

## II

The State pleads necessity as justification for the prosecutor's action in these cases. It argues that the discrepancy between an exculpatory story at trial and silence at time of arrest gives rise to an inference that the story was fabricated somewhere along the way, perhaps to fit within the seams of the State's case as it was developed at pretrial hearings. Noting that the prosecution usually has little else with which to counter such an exculpatory story, the State seeks only the right to cross-examine a defendant as to post-arrest silence for the limited purpose of impeachment. In support of its position the State emphasizes the importance of cross-

---

[6] Petitioners also claim constitutional error because each of them was cross-examined by the prosecutor as to why he had not told the exculpatory story at the preliminary hearing or any other time prior to the trials. In addition, error of constitutional dimension is asserted because each petitioner was cross-examined as to post-arrest, preliminary hearing, and general pretrial silence when he testified as a *defense witness* at the other petitioner's trial. These averments of error present different considerations from those implicated by cross-examining petitioners as defendants as to their silence after receiving *Miranda* warnings at the time of arrest. In view of our disposition of this case we find it unnecessary to reach these additional issues.

examination in general, see *Brown* v. *United States,* 356 U. S. 148, 154–155 (1958), and relies upon those cases in which this Court has permitted use for impeachment purposes of post-arrest statements that were inadmissible as evidence of guilt because of an officer's failure to follow *Miranda*'s dictates. *Harris* v. *New York,* 401 U. S. 222 (1971); *Oregon* v. *Hass,* 420 U. S. 714 (1975); see also *Walder* v. *United States,* 347 U. S. 62 (1954). Thus, although the State does not suggest petitioners' silence could be used as evidence of guilt, it contends that the need to present to the jury all information relevant to the truth of petitioners' exculpatory story fully justifies the cross-examination that is at issue.

Despite the importance of cross-examination,[7] we have concluded that the *Miranda* decision compels rejection of the State's position. The warnings mandated by that case, as a prophylactic means of safeguarding Fifth Amendment rights, see *Michigan* v. *Tucker,* 417 U. S. 433, 443–444 (1974), require that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation. Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested.[8] See *United States* v. *Hale, supra,*

---

[7] We recognize, of course, that unless prosecutors are allowed wide leeway in the scope of impeachment cross-examination some defendants would be able to frustrate the truth-seeking function of a trial by presenting tailored defenses insulated from effective challenge. See generally *Fitzpatrick* v. *United States,* 178 U. S. 304, 315 (1900).

[8] The dissent by MR. JUSTICE STEVENS expresses the view that the giving of *Miranda* warnings does not lessen the "probative value of [a defendant's] silence . . . ." *Post,* at 621. But in *United*

at 177. Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.[9]

---

*States* v. *Hale,* 422 U. S. 171, 177 (1975), we noted that silence at the time of arrest may be inherently ambiguous even apart from the effect of *Miranda* warnings, for in a given case there may be several explanations for the silence that are consistent with the existence of an exculpatory explanation. In *Hale* we exercised our supervisory powers over federal courts. The instant cases, unlike *Hale,* come to us from a state court and thus provide no occasion for the exercise of our supervisory powers. Nor is it necessary, in view of our holding above, to express an opinion on the probative value for impeachment purposes of petitioners' silence. We note only that the *Hale* court considered silence at the time of arrest likely to be ambiguous and thus of dubious probative value.

[9] A somewhat analogous situation was presented in *Johnson* v. *United States,* 318 U. S. 189 (1943). A defendant who testified at his trial was permitted by the trial judge to invoke the Fifth Amendment privilege against self-incrimination in response to certain questions on cross-examination. This Court assumed that it would not have been error for the trial court to have denied the privilege in the circumstances, see *id.,* at 196, in which case a failure to answer would have been a proper basis for adverse inferences and a proper subject for prosecutorial comment. But because the privilege had been granted, even if erroneously, "the requirements of fair trial" made it error for the trial court to permit comment upon the defendant's silence. *Ibid.*

"An accused having the assurance of the court that his claim of privilege would be granted might well be entrapped if his assertion of the privilege could then be used against him. His real choice might then be quite different from his apparent one. . . . Elementary fairness requires that an accused should not be misled on that score." *Id.,* at 197.

*Johnson* was decided under this Court's supervisory powers over the federal courts. But the necessity for elementary fairness is not

MR. JUSTICE WHITE, concurring in the judgment in *United States* v. *Hale, supra,* at 182–183, put it very well:

"[W]hen a person under arrest is informed, as *Miranda* requires, that he may remain silent, that anything he says may be used against him, and that he may have an attorney if he wishes, it seems to me that it does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony. . . . Surely Hale was not informed here that his silence, as well as his words, could be used against him at trial. Indeed, anyone would reasonably conclude from *Miranda* warnings that this would not be the case." [10]

We hold that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment.[11] The State has not

---

unique to the federal criminal system. Cf. *Raley* v. *Ohio,* 360 U. S. 423, 437–440 (1959).

[10] The dissenting opinion relies on the fact that petitioners in this case, when cross-examined about their silence, did not offer reliance on *Miranda* warnings as a justification. But the error we perceive lies in the cross-examination on this question, thereby implying an inconsistency that the jury might construe as evidence of guilt. After an arrested person is formally advised by an officer of the law that he has a right to remain silent, the unfairness occurs when the prosecution, in the presence of the jury, is allowed to undertake impeachment on the basis of what may be the exercise of that right.

[11] It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told

claimed that such use in the circumstances of this case might have been harmless error. Accordingly, petitioners' convictions are reversed and their causes remanded to the state courts for further proceedings not inconsistent with this opinion.

*So ordered.*

MR. JUSTICE STEVENS, with whom MR. JUSTICE BLACKMUN and MR. JUSTICE REHNQUIST join, dissenting.

Petitioners assert that the prosecutor's cross-examination about their failure to mention the purported "frame" until they testified at trial violated their constitutional right to due process and also their constitutional privilege against self-incrimination. I am not persuaded by the first argument; though there is merit in a portion of the second, I do not believe it warrants reversal of these state convictions.

## I

The Court's due process rationale has some of the characteristics of an estoppel theory. If (a) the defendant is advised that he may remain silent, and (b) he does remain silent, then we (c) presume that his decision was made in reliance on the advice, and (d) conclude that it is unfair in certain cases, though not others,[1] to use his silence to impeach his trial testimony. The key to the Court's analysis is apparently a concern that the *Miranda* warning, which is intended to increase the prob-

the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest. Cf. *United States* v. *Fairchild,* 505 F. 2d 1378, 1383 (CA5 1975).

[1] As the Court acknowledges, the "fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest." *Ante,* at 619 and this page, n. 11.

ability that a person's response to police questioning will be intelligent and voluntary, will actually be deceptive unless we require the State to honor an unstated promise not to use the accused's silence against him.

In my judgment there is nothing deceptive or prejudicial to the defendant in the *Miranda* warning.[2] Nor do I believe that the fact that such advice was given to the defendant lessens the probative value of his silence, or makes the prosecutor's cross-examination about his silence any more unfair than if he had received no such warning.

This is a case in which the defendants' silence at the time of their arrest was graphically inconsistent with their trial testimony that they were the unwitting victims of a "frameup" in which the police did not participate. If defendants had been framed, their failure to mention that fact at the time of their arrest is almost

---

[2] At Wood's trial, the arresting officer described the warning he gave petitioners:

"I told Mr. Wood and Mr. Doyle of the Miranda warning rights— they had the right to remain silent, anything they said could and would be used against them in a court of law, and they had the right to an attorney and didn't have to say anything without an attorney being present and if they couldn't afford one, the court would appoint them one at the proper time." Trial transcript in *Ohio* v. *Wood*, No. 10657, Common Pleas Court, Tuscarawas County, Ohio (hereafter Wood Tr.), 126. At the Doyle trial, he testified that he "gave them their rights" and gave them a " 'Miranda Warning.' " Trial transcript in *Ohio* v. *Doyle*, No. 10656, Common Pleas Court, Tuscarawas County, Ohio (hereafter Doyle Tr.), 269. *Miranda* v. *Arizona*, 384 U. S. 436, requires the following warning:

"[The suspect] must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.*, at 479.

inexplicable; for that reason, under accepted rules of evidence, their silence is tantamount to a prior inconsistent statement and admissible for purposes of impeachment.[3]

Indeed, there is irony in the fact that the *Miranda* warning provides the only plausible explanation for their silence. If it were the true explanation, I should think that they would have responded to the questions on cross-examination about why they had remained silent by stating that they relied on their understanding of the advice given by the arresting officers. Instead, however, they gave quite a different jumble of responses.[4] Those

---

[3] 3A J. Wigmore, Evidence § 1042 (Chadbourn rev. 1970).

[4] Petitioner Doyle gave the following testimony on direct and cross-examination at his trial:

"Q. [By defense counsel.] And you were placed under arrest at that time?

"A. [By Doyle.] Yes. I asked what for and he said,—'For the sale of marijuana.' I told him,—I didn't know what he was talking about.

.        .        .        .        .

"Q. [By the prosecutor.] As a matter of fact, if I recall your testimony correctly, you said instead of protesting your innocence, as you do today, you said in response to a question of Mr. Beamer,—'I don't know what you are talking about.'

"A. [By Doyle.] I believe what I said,—'What's this all about?' If I remember, that's the only thing I said.

"Q. You testified on direct.

"A. If I did, then I didn't understand.

". . . I was questioning, you know, what it was about. That's what I didn't know. I knew that I was trying to buy, which was wrong, but I didn't know what was going on. I didn't know that Bill Bonnell was trying to frame me, or what-have-you.

.        .        .        .        .

"Q. All right,—But you didn't protest your innocence at that time?

.        .        .        .        .

responses negate the Court's presumption that their silence was induced by reliance on deceptive advice.

Since the record requires us to put to one side the

"A. Not until I knew what was going on." Doyle Tr. 479, 506–507.

At Wood's trial, Doyle gave a somewhat different explanation of his silence at the time of arrest:

"Q. [By the prosecutor.] Why didn't [Wood] tell [the police officers] about Mr. Bonnell?

"A. [By Doyle.] Because we didn't know what was going on and wanted to find out.

"Q. So he hid the money under the mat?

"A. The police officers said they stopped us for a red light. I wanted to get my hands on Bill Bonnell.

"Q. It wasn't because you were guilty, was it?

"A. Because I wanted to get my hands on Bill Bonnell because I suspected he was trying . . .

"Q. Why didn't you tell the police that Bill Bonnell just set you up?

"A. Because I would rather have my own hands on him.

.     .     .     .     .

"Q. When Mr. Beamer arrived?

"A. . . . [W]hen Mr. Beamer got there I said to Mr. Beamer what the hell is all this about and he said you are under arrest for the suspicion of selling marijuana and I said you got to be crazy. I was pretty upset.

.     .     .     .     .

"Q. So on the night of April 29 you felt that you were being framed like you are being framed today?

"A. I was so confused that night, the night of the arrest.

"Q. How about Mr. Wood?

"A. Mr. Wood didn't know what was going on.

.     .     .     .     .

"Q. . . . Are you as mad and upset today as you were that night?

"A. I can't answer that question.

"Q. Did you feel the same way about what happened to you?

"A. That night I felt like I couldn't believe what was happening.

"Q. You didn't like being framed?

Court's presumption that the defendants' silence was the product of reliance on the *Miranda* warning, the Court's entire due process rationale collapses. For without re-

---

"A. That is right. I didn't like some one putting me in a spot like that.

"Q. Didn't it occur to you to try to protect yourself?

"A. Yes, at this time I felt like I wasn't talking to nobody but John James who was the attorney at that time.

"Q. But you felt . . .

"A. The man walked up and didn't ask me anything.

"Q. You didn't talk to a soul about how rotten it was because you were framed?

.     .     .     .     .

"A. I will answer the question, sir, the best I can. I didn't know what to say. I was stunned about what was going on and I was asked questions and I answered the questions as simply as I could because I didn't have nobody there to help me answer the questions.

"Q. Wouldn't that have been a marvelous time to protest your innocence?

.     .     .     .     .

"A. I don't know if it would or not.

"Q. Do you remember having a conversation with Kenneth Beamer?

"A. Yes, sir.

"Q. What was said?

.     .     .     .     .

"A. Kenneth Beamer said I want to know where you stash— where your hide out is, where you are keeping the dope and I said I don't know what you are talking about. I believe the question was asked in front of you.

"Q. Where did this conversation take place?

"A. Took place during the search.

.     .     .     .     .

"Q. So any way you didn't tell anyone how angry you were that night?

.     .     .     .     .

"A. I was very angry.

"Q. But you didn't tell anyone?

liance on the waiver, the case is no different than if no warning had been given, and nothing in the Court's opinion suggests that there would be any unfairness in

---

"A. That is right. If I started I don't know where I would have stopped. I was upset." Wood Tr. 424–430.

Petitioner Wood testified on cross-examination at his trial as follows:

"Q. [By the prosecutor.] Jefferson Doyle said he was confused, angry and upset [at the time of the arrest]. Were you confused, angry and upset?

.          .          .          .          .

"A. [By Wood.] Upset and confused.

"Q. Why were you upset?

"A. Because I didn't know what was going on most of the time.

"Q. Why would you be upset? Because you found $1300 in your back seat?

"A. Mainly because the person that was in the car Jeff [Doyle] was upset confused and angry and . . .

"Q. What has that to do with you?

"A. I am in the car. That is what it has to do with me.

.          .          .          .          .

"Q. You are innocent?

"A. Yes.

"Q. Of anything?

"A. I don't know about anything.

"Q. This particular incident, you were placed under arrest, weren't you?

"A. Yes, innocent of this incident.

"Q. Innocent of the entire transaction?

"A. Yes, sir.

"Q. Or even any knowledge of the entire transaction?

"A. Up to a point, sir.

.          .          .          .          .

"Q. Mr. Wood, if that is all you had to do with this and you are innocent, when Mr. Beamer arrived on the scene why didn't you tell him?

.          .          .          .          .

"A. Mr. Cunningham, in the last eight months to a year there has been so many implications, etc. in the paper and law enforcement that are setting people up and busting them for narcotics and stuff." Wood Tr. 467–469.

using petitioners' prior inconsistent silence for impeachment purposes in such a case.

Indeed, as a general proposition, if we assume the defendant's silence would be admissible for impeachment purposes if no *Miranda* warning had been given, I should think that the warning would have a tendency to salvage the defendant's credibility as a witness. If the defendant is a truthful witness, and if his silence is the consequence of his understanding of the *Miranda* warning, he may explain that fact when he is on the stand. Even if he is untruthful, the availability of that explanation puts him in a better position than if he had received no warning. In my judgment, the risk that a truthful defendant will be deceived by the *Miranda* warning and also will be unable to explain his honest misunderstanding is so much less than the risk that exclusion of the evidence will merely provide a shield for perjury that I cannot accept the Court's due process rationale.

Accordingly, if we assume that the use of a defendant's silence for impeachment purposes would be otherwise unobjectionable, I find no merit in the notion that he is denied due process of law because he received a *Miranda* warning.

## II

Petitioners argue that the State violated their Fifth Amendment privilege against self-incrimination by asking the jury to draw an inference of guilt from their constitutionally protected silence. They challenge both the prosecutor's cross-examination and his closing argument.

## A

Petitioners claim that the cross-examination was improper because it referred to their silence at the time of

their arrest, to their failure to testify at the preliminary hearing, and to their failure to reveal the "frame" prior to trial. Their claim applies to the testimony of each defendant at his own trial, and also to the testimony each gave as a witness at the trial of the other. Since I think it quite clear that a defendant may not object to the violation of another person's privilege,[5] I shall only discuss the argument that a defendant may not be cross-examined about his own prior inconsistent silence.

In support of their objections to the cross-examination about their silence at the time of arrest, petitioners primarily rely on the statement in *Miranda* v. *Arizona,* 384 U. S. 436, that the prosecution may not use at trial the fact that the defendant stood mute or claimed the privilege in the face of accusations during custodial interrogation.[6] There are two reasons why that statement does not adequately support petitioners' argument.

First, it is not accurate to say that the petitioners "stood mute or claimed the privilege in the face of accusations." Neither petitioner claimed the privilege and

---

[5] See *Massiah* v. *United States,* 377 U. S. 201, 206–207; 8 J. Wigmore, Evidence § 2270, pp. 416–417 (McNaughton rev. 1961); cf. *Alderman* v. *United States,* 394 U. S. 165, 174. Cross-examination and comment upon a witness' prior silence does not raise any inference prejudicial to the defendant, and indeed, does not even raise any inference that the defendant remained silent.

[6] "In accord with our decision today, it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation. Cf. *Griffin* v. *California,* 380 U. S. 609 (1965); *Malloy* v. *Hogan,* 378 U. S. 1, 8 (1964); Comment, 31 U. Chi. L. Rev. 556 (1964); Developments in the Law—Confessions, 79 Harv. L. Rev. 935, 1041–1044 (1966). See also *Bram* v. *United States,* 168 U. S. 532, 562 (1897)." 384 U. S., at 468 n. 37.

petitioner Doyle did not even remain silent.[7] The case is not one in which a description of the actual conversation between the defendants and the police would give rise to any inference of guilt if it were not so flagrantly inconsistent with their trial testimony. Rather than a claim of privilege, we simply have a failure to advise the police of a "frame" at a time when it most surely would have been mentioned if petitioners' trial testimony were true. That failure gave rise to an inference of guilt only because it belied their trial testimony.

Second, the dictum in the footnote in *Miranda* relies primarily upon *Griffin* v. *California,* 380 U. S. 609, which held that the Fifth Amendment, as incorporated in the Fourteenth, prohibited the prosecution's use of the defendant's silence in its case in chief. But as long ago as *Raffel* v. *United States,* 271 U. S. 494, this Court recognized the distinction between the prosecution's affirmative use of the defendant's prior silence and the use of prior silence for impeachment purposes. *Raffel* expressly held that the defendant's silence at a prior trial was admissible for purposes of impeachment despite the application in federal prosecutions of the prohibition that *Griffin* found in the Fifth Amendment. *Raffel, supra,* at 496-497.

Moreover, Mr. Chief Justice Warren, the author of the Court's opinion in *Miranda,* joined the opinion in *Walder* v. *United States,* 347 U. S. 62, which squarely held that a valid constitutional objection to the admissibility of evidence as part of the Government's case in chief did not bar the use of that evidence to impeach the defendant's trial testimony. The availability of an objection to the affirmative use of improper evidence does not provide the defendant "with a shield against contradiction of his untruths." *Id.,* at 65. The need to ensure the integrity

---

[7] See n. 4, *supra.*

of the truth-determining function of the adversary trial process has provided the predicate for an unbroken line of decisions so holding.[8]

---

[8] As the Court recently recognized in a most carefully considered opinion, an adversary system can maintain neither the reality nor the appearance of efficacy without the assurance that its judgments rest upon a complete illumination of a case rather than upon "a partial or speculative presentation of the facts." *United States* v. *Nixon*, 418 U. S. 683, 709. The necessity of insuring a complete presentation of all relevant evidence has led to the rule that a criminal defendant who voluntarily forgoes his privilege not to testify, and presents exculpatory or mitigating evidence, thereby subjects himself to relevant cross-examination without the right to reclaim Fifth Amendment protection on a selective basis. *Fitzpatrick* v. *United States*, 178 U. S. 304, 315.

"If he takes the stand and testifies in his own defense, his credibility may be impeached and his testimony assailed like that of any other witness, and the breadth of his waiver is determined by the scope of relevant cross-examination. '[H]e has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts.' " *Brown* v. *United States*, 356 U. S. 148, 154–155 (citation omitted).

One need not impute perjury to an entire class to acknowledge that a testifying defendant has more to gain and less to lose than an ordinary witness from fabrications upon the witness stand. Cf. *Reagan* v. *United States*, 157 U. S. 301, 304–311; *Taylor* v. *United States*, 390 F. 2d 278, 284–285 (CA8 1968) (Blackmun, J.). As the Court notes today: "Unless prosecutors are allowed wide leeway in the scope of impeachment cross-examination some defendants would be able to frustrate the truth-seeking function of a trial by presenting tailored defenses insulated from effective challenge." *Ante*, at 617 n. 7. In recognition of this fact, this Court has allowed evidence to be used for impeachment purposes that would be inadmissible as evidence of guilt. In *Walder* v. *United States*, 347 U. S. 62, evidence of narcotics unlawfully seized in connection with an aborted earlier case against a defendant was held admissible for the limited purpose of impeaching the defendant's testimony that he never had been associated with narcotics, although such evidence clearly was inadmissible for any purpose in the prosecution's case in chief. In *Harris* v. *New York*, 401 U. S. 222, the Court held admis-

Although I have no doubt concerning the propriety of the cross-examination about petitioners' failure to mention the purported "frame" at the time of their arrest, a more difficult question is presented by their objection to the questioning about their failure to testify at the preliminary hearing and their failure generally to mention the "frame" before trial. [9] Unlike the failure

sible for the purpose of impeaching a defendant's testimony certain partially inconsistent post-arrest statements which, although voluntary, were unavailable for the prosecution's case because they had been given by the defendant without benefit of *Miranda* warnings. And last Term, in a decision closely analogous to *Harris,* the Court held admissible for impeachment purposes post-arrest statements of a defendant made after he had received *Miranda* warnings and exercised his right to request a lawyer, but before he had been furnished with counsel as *Miranda* requires in such circumstances. *Oregon* v. *Hass,* 420 U. S. 714.

In each of these cases involving impeachment cross-examination, the need to insure the integrity of the trial by the "traditional truth-testing devices of the adversary process," *Harris* v. *New York, supra,* at 225, was deemed to outweigh the policies underlying the relevant exclusionary rules.

[9] Petitioner Doyle was cross-examined as follows at his trial:

"Q. [By the prosecutor.] All right. Do you remember the Preliminary Hearing in this case?

"A. [By Doyle.] Yes Sir. I remember it.

"Q. And that was prior to your indictment for this offense, was it not?

"A. Yes sir. I believe,—Yes Sir, it was before I was indicted.

"Q. Arraignment. Is that what you mean?

"A. Yes. The next day after the arrest.

"Q. Yes, when evidence was presented and you had the opportunity to hear the testimony of the witnesses against you. Remember that?

"A. Yes Sir.

"Q. Mr. Bonnell testified; Captain Griffin testified; Deputy—Chief Deputy White testified?

"A. Yes Sir.

"Q. Kenneth Beamer testified?

"A. Yes Sir.

to make the kind of spontaneous comment that discovery of a "frame" would be expected to prompt, there is no significant inconsistency between petitioners' trial testi-

"Q. You were there, weren't you?
"A. Yes Sir.
"Q. And your lawyer was there,—Mr. James?
"A. Yes Sir.
"Q. Tape recording was made of the transcript?
"A. Yes Sir.
"Q. Did you protest your innocence at that proceeding?

.          .          .          .

"A. I didn't—everything that was done with that was done with my attorney. My attorney did it.
"Q. All right. The first time that you gave this version of the fact was in the trial of Richard Wood,—was it not?

.          .          .          .          .

"A. Yes Sir. It was the first time I was asked.
"Q. All the time, you being innocent?
"A. Yes Sir." Doyle Tr. 507–508.
Petitioner Wood was subjected to similar cross-examination at his trial:
"Q. [By the prosecutor.] As a matter of fact you never told anyone that you had been set up until today?

.          .          .          .

"A. [By Wood.] Yes, I believe I did, sir.
"Q. I assume you discussed it with your lawyer?
"A. Yes, I discussed it with my lawyer.
"Q. And you heard the testimony and witnesses against you?
"A. Yes, sir.
"Q. And were you aware Mr. James was able to obtain a tape transcript of the proceedings?
"A. Yes.
"Q. And you no doubt listened to those?
"A. Parts and portions of them—some of it.
"Q. But you never communicated your innocence?
"A. I believe I did one time to Mr. Beamer.
"Q. When might that have been?
"A. When in the jail house.
"Q. So you protested your innocence?
"A. In a little room. I believe he asked us how do you let

mony and their adherence to counsel's advice not to take the stand at the preliminary hearing; moreover, the decision not to divulge their defense prior to trial is probably attributable to counsel rather than to petitioners.[10] Nevertheless, unless and until this Court overrules *Raffel* v. *United States,* 271 U. S. 494,[11] I think a state court is

---

people get away with people setting up friends like this. He said Bill Bonnell is not your friend and I said no, but I figured he was a good enough acquaintance he would do that.

"Q. Where was that?

"A. Little room there.

"Q. Ever been there before?

"A. Yes, sir.

"Q. When?

.        .        .        .        .

"Q. Did you see me there?

"A. I didn't know who you were at the time. I believe you were in and out of there.

"Q. You didn't say anything to me, did you?

"A. No, I didn't know who you were then." Wood Tr. 470–472.

[10] Under Ohio law, the preliminary hearing determines only whether the defendant should be held for trial. The prosecution need establish, at most, that a crime has been committed and that there is "probable and reasonable cause" to hold the defendant for trial; and the court need only find "substantial credible evidence" of the charge against the defendant. Ohio Rev. Code Ann. §§ 2937.12, 2937.13 (Supp. 1973). Indeed, if a defendant has been indicted, no hearing need be held. *State* v. *Morris,* 42 Ohio St. 2d 307, 326, 329 N. E. 2d 85, 97 (1975). Defense counsel thus will have no incentive to divulge the defendant's case at the preliminary hearing if the prosecution has presented substantial evidence of guilt. Since that was the case here, no significant impeaching inference may be drawn from petitioners' silence at that proceeding.

Petitioners' failure to refer to the "frame" at any time between arrest and trial is somewhat more probative; for if the "frame" story were true, one would have expected counsel to try to persuade the prosecution to dismiss the charges in advance of trial.

[11] *Raffel* was the last decision of this Court to address the constitutionality of admitting evidence of a defendant's prior silence

free to regard the defendant's decision to take the stand as a waiver of his objection to the use of his failure to testify at an earlier proceeding or his failure to offer his version of the events prior to trial.

## B

In my judgment portions of the prosecutor's argument to the jury overstepped permissible bounds. In each trial, he commented upon the defendant's silence not only as inconsistent with his testimony that he had been "framed,"

---

to impeach his testimony upon direct examination. Raffel had been charged with conspiracy to violate the National Prohibition Act. An agent testified at his first trial that he had admitted ownership of a drinking place; Raffel did not take the stand. The trial ended in a hung jury, and upon retrial, the agent testified as before. Raffel elected to testify and denied making the statement, but he was cross-examined on his failure to testify in the first trial. This Court held that the evidence was admissible because Raffel had completely waived the privilege against self-incrimination by deciding to testify. 271 U. S., at 499.

Subsequent cases, decided in the exercise of this Court's supervisory powers, have diminished the force of *Raffel* in the federal courts. *United States* v. *Hale,* 422 U. S. 171; *Stewart* v. *United States,* 366 U. S. 1; *Grunewald* v. *United States,* 353 U. S. 391. All three of these cases held that the defendant's prior silence or prior claim of the privilege was inadmissible for purposes of impeachment; all three distinguished *Raffel* on the ground that the Court there assumed that the defendant's prior silence was significantly inconsistent with his testimony on direct examination. *Hale, supra,* at 175–176; *Stewart, supra,* at 5–7; *Grunewald, supra,* at 418–424. Two of the three cases relied upon the need to protect the defendant's exercise of the privilege against self-incrimination from unwarranted inferences of guilt, a rationale that is not easily reconciled with the reasoning in *Raffel* that the decision to testify constitutes a complete waiver of the protection afforded by the privilege. Compare *Hale, supra,* at 180 and n. 7, and *Grunewald, supra,* at 423–424, with *Raffel,* 271 U. S., at 499.

but also as inconsistent with the defendant's innocence.[12] Comment on the lack of credibility of the defendant is plainly proper; it is not proper, however, for the prosecu-

---

[12] At Doyle's trial, the prosecutor made the following arguments to the jury:

"Diffuse what the true facts are; obscure the facts and prosecute the prosecution.

"A typical and classic defense, but keep in mind, when you are considering the testimony of the law enforcement officers involved, that not until, Ladies and Gentlemen, not until the trial of this case and prior to this case, the trial of Richard Wood's case, that anybody connected with the prosecution in this case had any idea what stories would be told by Jefferson Doyle and Richard Wood. Not the foggiest idea. Both of them told you on the witness stand that neither one of them said a word to the law enforcement officials on the scene—

. . . . .

"(continuing) on the scene at the point of their arrest, at the Preliminary Hearing before Indictment in this case. Not a word that they were innocent; that this was their position; that somehow, they had been 'set-up.'

"So, when you evaluate the testimony of the Law Enforcement Officials, consider—

. . . . .

"(continuing)—what they had to deal with on the night in question and the months subsequent to that.

. . . . .

"Then they decide that they have been 'had' somehow. They have been framed.

"Now, remember, this fits with the facts as observed by the law enforcement officers except the basic, crucial facts. Somehow, they have been framed. So, if you can believe this, Ladies and Gentlemen, they take off, chase Bill Bonnell around to give his money back to him or ask him what he did to them, yet they don't bother to tell the Law Enforcement Officers.

"It is unbelievable. I think, when you go to the Jury Room, Ladies and Gentlemen, you are going to decide what really happened.

. . . . .

"We have the Fifth Amendment. I agree with it. It is funda-

tor to ask the jury to draw a direct inference of guilt from silence—to argue, in effect, that silence is inconsistent with innocence. But since the two inferences—per-

---

mental to our sense and system of fairness, but if you are innocent—

. . . . .

"(continuing)—if you are innocent, Ladies and Gentlemen, if you have been framed, if you have been set-on, etc. etc. etc., as we heard in Court these last days, you don't say, when the law enforcement officer says,—'You are under arrest,'—you don't say,—'I don't know what you are talking about.' You tell the truth. You tell them what happened and you go from there. You don't say,—'I don't know what you are talking about,'— and demand to see your lawyer and refuse to permit a search of your vehicle, forcing the law enforcement agents to get a search warrant.

"If you're innocent, you just don't do it." Doyle Tr. 515–516, 519, 526.

At Wood's trial, he made similar arguments:

"The defense in this case was very careful to make no statements at all until they had the benefit of hearing all the evidence against them and had time to ascertain what they would admit and what they would deny and how they could fit their version of the story with the state's case. During none of this time did we ever hear any business about a set up or frame or anything else. All right.

"Yes, it is the law of our land, and rightfully so, ladies and gentlemen, that nobody must be compelled to incriminate themselves. It is the 5th Amendment. No one can be forced to give testimony against themselves where criminal action charges are pending. It is a very fundamental right and I am glad we have it.

"The idea was nobody can convict himself out of his own mouth and it grew out of the days when they used to whip and beat and extract statements from the defendants and get them to convict themselves out of their own mouth, and I am glad we have that right.

"But ladies and gentlemen, there is one statement I am going to make. If you are innocent, if you are innocent, if you have been framed, if you have been set up as claimed in this case, when do you tell it? When do you tell the policemen that?

. . . . .

"Think about it. After months—after various proceedings and

jury and guilt—are inextricably intertwined because they have a common source, it would be unrealistic to permit comment on the former but to find reversible error in the slightest reference to the latter. In the context of the entire argument and the entire trial, I am not persuaded that the rather sophisticated distinction between permissible comment on credibility and impermissible comment on an inference of guilt justifies a reversal of these state convictions.[13]

Accordingly, although I have some doubt concerning the propriety of the cross-examination about the preliminary hearing and consider a portion of the closing argument improper, I would affirm these convictions.

---

for the first time? I am not going to say any more about that but I want you to think about it." Closing Argument of the Prosecutor 12–14, supplementing Wood Tr.

[13] Petitioner Doyle also argues that he was erroneously cross-examined at his trial on his failure to consent to a search of the car he was driving at the time of the arrest. Petitioner Wood appears to raise the similar claim that testimony of other witnesses that he failed to consent to a search of the car was erroneously admitted at his trial. The parties have not argued these issues separately from the questions whether prior silence in various circumstances may be admitted to impeach a defendant or a defense witness. It is apparent, however, that these questions implicate Fourth Amendment issues that merit independent examination. Accordingly, like the Court, I do not address them.