### Arthur Michael PARKS, Appellant,

### v.

### The STATE of Oklahoma, Appellee.

### No. F–86–580.

Court of Criminal Appeals of Oklahoma.

Nov. 23, 1988.

Irvin Box and Diane Clowdus, Oklahoma City, for appellant.

Robert H. Henry, Atty. Gen., M. Caroline Emerson, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

PARKS, Judge:

Appellant, Arthur Michael Parks, was tried by jury and convicted of First Degree Murder (21 O.S.1981, § 701.7) in Stephens County District Court, Case No. CRF–85–159, before the Honorable George Lindley, District Judge. During the second stage, the jury set punishment at life imprisonment. Judgment and sentence was imposed accordingly. From this, appellant has perfected this appeal. We reverse and remand for a new trial.

On Saturday, June 1, 1985, appellant and his family attended a party at Clear Creek Lake. After the party they decided to camp, along with some friends, at the lake.

During the weekend camping trip, appellant showed a fellow camper a sawed-off shotgun which was in his van. The group remained at the lake through Sunday evening.

On the evening of Monday, June 3, 1985, Officer Darrell James, a lake ranger, heard gun shots around the area of Clear Creek Lake referred to as "Pervert Point." He left his home around 8:20 p.m. to investigate the shots. Upon arriving at the location, Officer James communicated to his supervisor that he had seen a white and brown van and he would investigate further. This communication occurred at 8:38 p.m.

Around 8:50 p.m., two other officers arrived at the scene and found Officer James deceased, with three gunshot wounds to the head and neck. Upon investigation, they recovered several beer cans, a cut-off trouser leg and various sizes of gun shells. Several witnesses remembered seeing a brown and white van with the word "security" written across the front and a triangle emblem on the side.

The following day, officers determined that a van matching the description given by the witnesses was owned by appellant. They obtained an search warrant for appellant's house and seized a .45 caliber revolver and a shotgun, long with various ammunition. It was later determined that neither gun was used in the killing of Officer James. They impounded appellant's van due to the present of blood on the driver's side of the vehicle.

Appellant was arrested from Taliaferro Mental Health Center, where he was undergoing treatment for alcohol dependency. After giving appellant the *Miranda* warnings, appellant was interrogated by police officers until he stated that he wanted to speak with an attorney. At trial, appellant admitted drinking beer at Clear Creek Lake on Monday evening, but he denied seeing or killing Officer James.

Because we find the issue of prosecutorial misconduct determinative, it is unnecessary to address appellant's other propositions. Appellant alleges that the prosecutor's statements during the state's

case-in-chief, cross-examination of appellant and closing argument regarding appellant's post-arrest silence require reversal. We must agree.

During the direct examination of Officer Calger, in response to a question asked by the prosecutor, Officer Calger stated as follows:

A: ... At that point I told Mr. Parks I had some witnesses that I believed could put him at the lake on Monday. At that point Mr. Parks said I think I need my lawyer and when he mentioned that, it term—the interview was terminated.

Later, during the cross-examination of appellant, the prosecutor asked the following questions:

Q: (By Mr Burns) If you, Sir, did not kill Officer James, then you were at the location and you would be the only person that would have seen the other two men and that woman and the pickup that they were in, brown pickup, that would have any idea what they looked like or who they were.

A: That's correct.

Q: If that was the case, Sir, when Officer Calger was asking you—you knew what you were charged with—

A: Right.

Q: —and he was asking you about what happened—

A: Right.

Q: Why, Sir, did you not at least describe these men and this pickup and this woman so that the police could be looking for them?

A: ... I wasn't going to tell anybody anything until I saw an attorney, and I didn't see an attorney for quite a long time after that either.

Q: The point I'm asking, Sir, is that if you really didn't kill the Park Ranger, at that point, you would have been probably the only witness to have seen the brown van—

A: It wasn't—

Q: —brown pickup, excuse me, a man— two men and a woman, and there is nothing wrong, Sir, incriminating to you in any way about describing something that you're telling the Jury now that you

saw out there. That there would be absolutely nothing incriminating about you telling that to Officer Calger?

\* \* \* \* \* \*

Q: (By Mr. Burns) My real question is, why did you not tell Officer Calger about these people that you're now testifying that you saw out there?

At this point defense counsel objected to the line of questioning. However, the prosecutor did not avoid the questions regarding appellant's post-arrest silence as later in the cross-examination, the prosecutor again called attention to the fact that appellant refused to answer questions and requested an attorney:

Q: (By Mr. Burns) I wrote a quote down when I was talking about—when you were testifying earlier about your conversations or interview with Les Calger over in Lawton, and then you were explaining at what point that—that you terminated the interview. Realized that you needed a lawyer ...

Mr. Burns again delved into the area of appellant's post-arrest silence during his closing arguments:

BY MR. BURNS: ... We do know in this case that Arthur Parks denied being at the lake, and that's one of those whys he says that I asked you and I ask you why. At the time that Arthur Parks was arrested, do you remember the statement that he made, that he confirmed here in his own testimony, that he made to—the statement to the officers, he said, what makes you think I killed someone? Was Arthur Parks at that time inquiring as to what evidence the officers actually had? Ladies and Gentlemen, you know, I'm certainly not commenting upon what— his right to remain silent because he chose not to do so. He chose to talk to the officers up to a certain point, which included the relevant issue of whether he had been to the lake or not, and only when he was confronted with—by Officer Calger, that Officer Calger had witnesses who could put him in the lake area, at that point, you know, Officer

Calger told you that he terminated the interview.

Mr. Burns asked the jury to consider appellant's post-arrest silence when determining his guilt or innocence:

> BY MR. BURNS: ... Use common sense about these questions when someone comes and tells you you're arrested and that you have been charged with First Degree Murder, use your common sense that yes, it's good to get you a lawyer, but at what point you feel it's necessary to get you a lawyer if you didn't do anything wrong, why would you conceal about being to the lake? At that point and time, if a man has been brutally murdered out here, why would you not want the murderers to be caught and tell the officers where you were and what you saw. That's not what happened here. I ask you to use your common sense.

This Court has repeatedly held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violat[es] the Due Process Clause of the Fourteenth Amendment." *Smith v. State,* 744 P.2d 1282, 1284 (Okla.Crim.App.1987), citing *Doyle v. Ohio,* 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976). Such a violation can rise to the level of "clear, fundamental, and reversible error" when the State cross-examines the defendant on his failure to come forward and make a statement prior to trial, and when the State stresses that failure during closing argument. *See Smith,* 744 P.2d at 1284, quoting *Buchanan v. State,* 523 P.2d 1134, 1137 (Okla.Crim.App.1974). Both of these occurred in the case at bar.

The *Miranda* warnings imply that the exercise of the right to remain silent will carry no penalty. *See Smith,* 744 P.2d at 1284; *Kreijanovsky v. State,* 706 P.2d 541, 543–44 (Okla.Crim.App.1985). In the present case, appellant was penalized by his exercise of this constitutional right. The State specifically asked the jury to consider appellant's silence and to use it against him when determining guilt or innocence. Furthermore, this is not a case wherein the prosecutor made one isolated comment; rather, on numerous occasions, Mr. Burns referred to appellant's post-arrest silence, thereby compounding the error.

In the similar case of *Gooden v. State,* 617 P.2d 248, 249 (Okla.Crim.App.1980), this Court held that the prosecutor committed reversible error by questioning the defendant's reason for not coming forward with his alibi. As in the present case, the prosecutor in *Gooden* repeatedly asked why the defendant had not proclaimed his innocence. This Court held such questions and comments to be improper. In *Dungan v. State,* 651 P.2d 1064, 1065–66 (Okla.Crim.App.1982), this Court held that a comment which was introduced during the State's case-in-chief regarding the defendant's post-arrest silence was sufficient to require reversal, even in the absence of an objection by defense counsel. The case at bar presents fundamental errors which are much more flagrant than *Dungan,* insofar as the State illicited testimony regarding appellant's post-arrest silence during its case-in-chief, during the cross-examination of appellant and made further comments during closing arguments. The prosecutor repeatedly called attention to the fact that appellant chose to remain silent and asked for an attorney. We cannot say that such comments did not prejudice appellant, especially in light of the weak evidence presented against him.

Accordingly, the judgment and sentence is REVERSED and the case is REMANDED for a new trial.

BRETT, P.J., concurs.

BUSSEY, J., concurs in result.