878 F.2d 383
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Jerome WILSON, Petitioner-Appellant
v.
H. Gary WELLS, Respondent-Appellee.
 No. 88-1496.
 United States Court of Appeals, Sixth Circuit.
 July 3, 1989.
 
 Before MERRITT and MARTIN, Circuit Judges, and LIVELY, Senior Circuit Judge
 MERRITT, Circuit Judge.
 
 
 1
 In this habeas case, petitioner Jerome Wilson appeals from the denial of the writ by Judge Richard A. Enslen of the Western District of Michigan. Wilson stands convicted by a Michigan jury of felony murder, and is serving a mandatory life sentence. He challenges his conviction on the grounds that the prosecutor violated his constitutional rights by cross-examining him about his silence in custody and by commenting on that silence in his closing arguments to the jury.
 
 I.
 
 2
 Wilson was charged by information with murder and felony murder in the death of a clerk at Miller's Market in Lincoln Township, Berrian County, Michigan. Either late at night on Saturday, July 15, 1978 or early in the morning hours of the next day, Alan Littman was shot three times in the back of the head while lying face-down in the market's meat cooler. The store was robbed of $6,000 in cash, much of it in recently obtained, wrapped Federal Reserve $1 bills, some of it in rolled coins. Wilson was charged in this crime. His acquaintance Isaac Hister served as a key witness for the state, testifying that Wilson came to his apartment between midnight and 2 A.M. on the 16th, carrying two pails full of money and seeking his help in hiding the money, the pails, the gun and some clothing.
 
 
 3
 Before he was arrested, Wilson was interviewed by police investigators three times, on July 26, August 3 and August 4, 1976. The first two interviews took place at Wilson's home; the third took place at the state police station in Benton Harbor, Michigan. The record before us includes the officers' formal reports for each interview, the first being a summary of Wilson's statements to the officers, the last two being transcripts of tape recordings taken with Wilson's knowledge. The records of the second and third interviews reflect that the officers advised Wilson of his right to remain silent and to secure retained or appointed counsel before commencing each conversation, and that Wilson waived these rights. Wilson was arrested at the close of the third session. The record does not disclose whether officers then gave Wilson a fresh Miranda warning, but it does appear that Wilson made no further statements at that time.
 
 
 4
 In each of the pre-arrest interviews, officers asked Wilson where he was on the night of July 15, 1978. In the first of the interviews, Wilson stated that he did not remember his activities on that night. In both of the other pre-arrest interviews, Wilson stated that he and his wife had spent the evening of July 15 playing cards with his friend Royce Alexander; that they came home around 11:00 or 11:30 P.M.; and that they watched T.V. for awhile before falling asleep. He made no mention of receiving a visit from Isaac Hister in any of these statements.
 
 
 5
 After Wilson's arrest on August 4, and apparently while he remained in custody, he consented to two further interviews with state officers, one on August 7 and another on August 8, 1978. The contents of these discussions are recorded in two reports included in the appellate record. They indicate that, on August 7, Wilson was advised of his rights and verbally waived them; that at that time Wilson provided certain facts about his background and acquaintanceship but made no statements about his activities before, during or after the night of the Miller Market robbery and Littman murder. The record of the August 8 interview is similarly bare of disclosures concerning Wilson's alibi. Wilson explained a financial transaction between himself and Royce Alexander, but it appears that the officers devoted the bulk of the interview to informing Wilson of the strength of the case against him and to seeking his cooperation. The interview closed with Wilson's saying that he wished to cooperate but would talk with a lawyer first.
 
 
 6
 At his trial, Wilson took the stand in his own defense and testified that it was not he who brought Hister but Hister who brought him buckets of cash from Miller Market on the night of July 15-16, 1978. Cross-examining Wilson and again at closing argument, the prosecution sought to impeach this testimony. It is these gestures of impeachment that provide the basis of Wilson's habeas petition. Wilson's petition points to the prosecutor's cross-examination of Wilson and to his closing argument to the jury, claiming that at both points Wilson's right to be free from inferences of guilt drawn from his exercise of his right to remain silent was breached.
 
 
 7
 The District Court below denied Wilson's petition, adopting in toto a magistrate's report as its own opinion and order. Both the magistrate and the District Court concluded that, even if Wilson had suffered a breach of his constitutional rights during cross-examination, any error was harmless.
 
 II.
 
 8
 Wilson relies chiefly on Doyle v. Ohio, 426 U.S. 610 (1976) (per curiam). In that case, also involving a habeas attack on a state conviction, the Supreme Court held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." Id. at 619. We note, however, that the rule announced in Doyle does not apply where the prosecution seeks to impeach a criminal defendant's testimony by pointing out its contradiction by prior inconsistent statements:
 
 
 9
 Doyle does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all.
 
 
 10
 Anderson v. Charles, 447 U.S. 404, 408 (1980) (per curiam). And even post-arrest silence may be the subject of impeaching cross-examination where the defendant cannot be said to have elected to remain silent in reliance on Miranda warnings. In Fletcher v. Weir, 455 U.S. 603 (1982) (per curiam), the prosecutor had impeached the defendant's exculpatory version of the crime--produced for the first time at trial--by asking why the defendant had not stated it when he was arrested. "The significant difference between the present case and Doyle," the Supreme Court noted, "is that the record does not indicate that respondent Weir received any Miranda warnings during the period in which he remained silent immediately after his arrest." Id. at 605. Because Weir had not been induced into his silence by the implicit promises of the Miranda warning, the Supreme Court held that the due process clause was not offended when, having taken the stand in his own defense, he was subjected to cross-examination into his post-arrest silence.
 
 III.
 A.
 
 11
 Applying these rules of law to the habeas petition before us, we see no merit at all in Wilson's claim that the prosecutor's closing argument violated his constitutional rights. The challenged passage is this:
 
 
 12
 When he talked to Immoos, after he was under arrest, he wasn't going to snitch on anybody, he wasn't going to snitch on Isaac Hister, the very man who has testified against him, who he knows, knew would testify against him. He said, "No, I would rather sit in jail under a charge of murder than snitch on Isaac Hister, the man who was going to put me down."
 
 
 13
 Does that make sense to you, ladies and gentlemen?
 
 
 14
 Tr. 1521.
 
 
 15
 Here the prosecutor refers not to any moment at which Wilson exercised his right to remain silent, but to his post-arrest interviews. At both of these interviews Wilson made positive statements to police. The prosecutor's rhetorical question asks the jury to consider why, if Wilson's exculpatory version of the events of July 15-16, 1978 were true, Wilson failed to disclose it to the officers when he made other statements to them after his arrest.
 
 
 16
 As the Supreme Court has held in Anderson v. Charles, 447 U.S. 404, this argumentative strategy invites the jury to make an inference not from silence but from speech. Further, in this case as in Anderson, the record clearly indicates that the speech from which the prosecutor would draw an inference was uttered by the defendant after a knowing and voluntary waiver of his rights. We see no constitutional defect in this passage from the prosecutor's closing argument.
 
 B.
 
 17
 The prosecutor's cross-examination of Wilson poses a more difficult problem. Wilson, on direct, had just proposed his explanation of the events of July 15-16, stating that Hister had come to his house from the crime scene bearing buckets of cash, had sought Wilson's help in covering up evidence of the crime, and had given Wilson the cash which, in its case in chief, the state had proven Wilson to have laundered or spent during his first few days after the crime.
 
 
 18
 The entire relevant passage of Wilson's cross-examination is reproduced here, with the challenged questions underlined:
 
 
 19
 Q. Do you remember talking to Det. Karsen on August 3, 1978? I will rephrase the question. Do you remember--
 
 
 20
 A. I don't recall.
 
 
 21
 Q. Do you recall talking to Det. Karsen, being interviewed by him and talking about your being fired at Miller's Market?
 
 
 22
 A. I don't recall the date, but I have talked to him about my being fired from Miller's.
 
 
 23
 Q. That was in August of 1978, wasn't it?
 
 
 24
 A. I talked to him in July, too.
 
 
 25
 Q. That's when you told him that you liked Alan; is that right?
 
 
 26
 A. I did. I had no grudge against Alan.
 
 
 27
 Q. Do you remember talking to Det. Karsen about your going to Grand Rapids?
 
 
 28
 A. Yes.
 
 
 29
 Q. Where you had been the night before?
 
 
 30
 A. Yes, I do.
 
 
 31
 Q. The night of July 15th?
 
 
 32
 A. Yes.
 
 
 33
 Q. Did you tell him at that time you and Royce Alexander played cards over at Royce's house?
 
 
 34
 A. I don't recall.
 
 
 35
 Q. Do you deny it?
 
 
 36
 A. No, I don't deny it. I just don't recall.
 
 
 37
 Q. Well, were you over at Royce's playing cards?
 
 
 38
 A. I was over to Royce's.
 
 
 39
 Q. Playing cards?
 
 
 40
 A. I don't recall if I was playing cards, but I was over there that night.
 
 
 41
 Q. In other words, you are saying you don't now remember?
 
 
 42
 A. I don't recall.
 
 
 43
 Q. Well, let me ask you, did you tell him you got home, oh, maybe 11, 11:30 from Royce Alexander's house that night?
 
 
 44
 A. No, I don't recall.
 
 
 45
 Q. Do you recall telling him that you looked at TV that night; that you wanted to go to Grand Rapids the next day; you went to bed?
 
 
 46
 A. Yes.
 
 
 47
 Q. To get an early start?
 
 
 48
 A. Yes, I did tell him that.
 
 
 49
 Q. Were you arrested at any point when you told him that?
 
 
 50
 A. No, I wasn't.
 
 
 51
 Q. Did you talk to him after you were arrested?
 
 
 52
 A. No, I didn't.
 
 
 53
 Q. When were you arrested?
 
 
 54
 A. The 4th.
 
 
 55
 Q. You talked to him on the 4th, though, didn't you?
 
 
 56
 A. We talked, but I didn't know I was arrested. When I got up to get ready to leave, I'm under arrest all of a sudden. I got kind of--
 
 
 57
 THE COURT: Excuse me, please identify which month, the 4th of what?
 
 
 58
 Q. The 4th of August, 1978; is that right?
 
 
 59
 A. I think so. I'm not sure of the date. It might have been the 5th now that I think about it.
 
 
 60
 Q. But you did talk to him after you were arrested?
 
 
 61
 A. I didn't know I was arrested.
 
 
 62
 Q. Well, the day you were arrested did you talk with him?
 
 
 63
 A. After he told me I was arrested, I stopped talking to him.
 
 
 64
 Q. Did you talk to him immediately before he placed you under arrest?
 
 
 65
 A. Yes.
 
 
 66
 Q. That was on August 4th, 1978?
 
 
 67
 A. I'm not sure of the date. It could have been the 4th, it could have been the 5th. It was on a Friday.
 
 
 68
 Q. You were told that you were under arrest. Did you at that time say anything to Det. Karsen about Isaac Hister?
 
 
 69
 A. No, I didn't.
 
 
 70
 Q. Why?
 
 
 71
 A. Why? Because I didn't want my family's life jeopardized by telling something I didn't know nothing about.
 
 
 72
 Q. That is your reason?
 
 
 73
 A. That is my reason. You just don't tell on anybody out there and then expect to come up here in court on it when you don't know nothing about nothing.
 
 
 74
 Tr. 1469-72 (emphasis added).
 
 
 75
 The prosecutor commenced this line of inquiry by focusing on the alibi Wilson had proposed in his August 3 interview with police investigators, specifically on the aspects of the alibi that were inconsistent with the exculpatory story Wilson had just told on the stand. The colloquy of Wilson and the prosecutor then becomes tangled, each speaker referring sometimes to Wilson's August 4, pre-arrest interview with investigators and sometimes to his silence after being arrested at the end of that interview. In this context, the challenged cross-examination is susceptible of two interpretations. First, it could be nothing more than an (imperfect) reference to Wilson's August 4 statement. Second, however, it could be an (equally imperfect) reference to Wilson's choice to remain silent the moment he was informed that he was under arrest.
 
 
 76
 If we were to adopt the former interpretation, the prosecutor's questions would be well within the scope of permissible cross-examination announced in Anderson v. Charles, for the same reasons that we stated in ruling that the prosecutor's reference to Wilson's post-arrest statements was permissible. If we were to adopt the latter interpretation, however, we would be presented with a fresh problem involving the application of the rule announced in Fletcher v. Weir: that is, was Wilson's post arrest silence induced by Miranda warnings? We are hampered in providing an answer to this question, furthermore, by the fact that the record does not disclose whether, in addition to the Miranda warnings given him at the beginning of the August 4 interview, Wilson received a fresh set of warnings on his arrest at the close of that interview.
 
 
 77
 If the error allegedly committed in this case were not harmless, we would have to reduce the ambiguity of the prosecutor's cross-examination to simplicity, and we might then also have to resolve the difficulties of the Fletcher v. Weir question described just above. We agree with the District Court below, however, that any error was harmless beyond a reasonable doubt, and we therefore hold that Wilson's habeas petition was properly denied without reaching those difficult questions. For even if the prosecutor's questions refer directly and only to Wilson's post-arrest silence, and even if he undertook that silence in reliance on the Miranda warnings--that is, even if there were a clear constitutional violation here--the violation added but little to the overwhelming case against him.
 
 
 78
 Wilson pitches his argument that the claimed error was not harmless on the reasonable doubt raised by his exculpatory story. When Wilson himself took the stand, he stated in his defense that he had been playing cards at the house of a friend, Royce Alexander, the night of the crime, but that he was at home before midnight and sat down to read; that he went running on the beach between 1:00 and 1:30 A.M.; that he returned home and was reading there when Hister came to the door bearing the pails of cash. He claimed that it was Hister who gave him cash from the robbery, not the other way around. Tr. 1418-1427.
 
 
 79
 This story would, if believed, explain away much of the circumstantial evidence against Wilson. It would explain why the prosecution was able to bring in so much evidence connecting Wilson with expenditures of the cash stolen from Miller's Market. Tr. 473, 476, 724-31, 1243-51. It would explain why, after being in debt for a long period, he was suddenly able to make a large deposit in small bills into a bank account, and to make several splurge purchases all in small bills and in rolled coins. Tr. 779-80, 797, 804-05, 870-75.
 
 
 80
 But it does not explain away all the evidence, and the evidence it does not explain away is of a character to make it unreasonable to believe Wilson's story. First, it does not explain why Wilson knew on the Friday before the robbery and murder that he would be able on the Monday immediately after the crime to make a payment, then 60 days delinquent, on his home mortgage. Tr. 770. And it doesn't explain why, while Wilson's explanation of his whereabouts during the hours in which the crime must have been committed is corroborated by no one, not even Royce Alexander, Tr. 1397, 1402-05, Hister's alibi for those hours is corroborated, Tr. 1487. Although we are sure that Agatha Christie or Dorothy Sayers could rescue Wilson's story by some amazing revelation, Wilson's habeas petition is limited to the evidence actually adduced at trial. That evidence makes Wilson's story simply unbelievable--and once his story is gone, all the circumstantial evidence connecting him with the proceeds of the robbery, not to mention Hister's testimony, weigh in very heavily against him.
 
 
 81
 The cross-examination recounted above implied that, if Wilson really had been visited by Hister on the night of the crime, he would have told the police about it. But even without that inference from Wilson's silence, other evidence made it unreasonable to believe Wilson's exculpatory story. Against this backdrop, any violation of Wilson's constitutional right to remain silent under Doyle is, beyond any reasonable doubt, harmless.
 
 
 82
 For all the foregoing reasons, the District Court's denial of the writ is affirmed.