**Charles DARNELL, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

**Michael A. NICKEL, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

Supreme Court of Kentucky.

Oct. 28, 1977.

Rehearing Denied Dec. 9, 1977.

Jack Emory Farley, Public Defender, William M. Radigan, Kevin M. McNally, Asst. Public Defenders, M. Gail Robinson, Co-Counsel, Frankfort, for appellants.

Robert F. Stephens, Atty. Gen., Mark F. Armstrong, Asst. Atty. Gen., Frankfort, for appellee.

JONES, Justice.

Charles (Chuck) Darnell and Michael (Mike) A. Nickel prosecute this appeal from judgments of conviction sentencing each of them to life imprisonment and two 20-year sentences pursuant to a jury verdict finding each of them guilty of murder and two counts of robbery in the first degree. See KRS 507.020(1)(a) and KRS 515.020. The trial court directed that the sentences be served consecutively.

Chuck and Mike present seven alleged errors in support of their argument for reversal. These issues will be discussed in the sequence presented in the briefs. However, before discussing the issues, it is necessary to detail pertinent facts as revealed by the record.

Virginia Adkins testified that around 3:00 P.M. on June 9, 1976, she stopped at the house of George and Hattie Darnell. She saw a person sitting in the chair inside, observed blood on the floor, and went to seek help. She returned with a neighbor and found that Hattie was covered with blood and was dead. George was on a bed in a back room seriously wounded, but was conscious.

Virginia also testified that she heard a car in the lane outside her house at about 3:00 A.M.; that the car was white, and that it "sounded . . . like a Ford." She concluded that the car was in the driveway about five minutes.

A pathologist performed an autopsy on Hattie's body. He found multiple and extensive wounds and lacerations about the head and left side of the face, and the area above the bridge of her nose. A piece of the right ear was missing; there were multiple fractures of the cranial bones. There was massive hemorrhage over the entire surface of the brain. The pathologist also found there was a gunshot wound in the lower neck. He testified that in his opinion death was caused by a massive intracranial hemorrhage.

Anthony Wayne Darnell (a co-indictee, who was granted a separate trial), testified that on June 8, 1976, he went to the home of Chuck's mother, Frances Darnell, around 12:30 or 1 o'clock. He was visiting with Chuck and his brother. Anthony and Chuck sat around drinking beer. At that time it appeared to Anthony that Chuck had no money. Later in the afternoon, Mike arrived and the three of them sat around drinking beer and talking about "old times and finding work." They continued drinking until 10:30 or 11 o'clock P.M., when they ran out of beer. Chuck and Mike borrowed Anthony's white Mercury automobile. Anthony went into the house, fell asleep and did not awaken until Chuck and Mike returned around 4:00 or 4:30 A.M.

Upon their return Mike and Chuck asked Anthony if he was ready to find work. At that time Chuck said they didn't have to worry about money now because he and Mike had enough. Chuck flashed his wallet to show the money and said that the source was from the sale of some of his personal items.

The trio took a cab to a hotel in Portsmouth, Ohio, where Mike and Chuck had left Anthony's car. Anthony observed Mike's finger was bleeding. The owner of the hotel testified that she found drops of blood on the sink and on a towel in Mike's room. Anthony repaired his car and after visiting Mike's brother, the three drove by way of Interstate 75 to Florida. In Tennessee, Mike removed a snub-nosed 22 caliber pistol from his pants, gave it to Chuck and told him to put the gun in the glove compartment. At one point in their journey, Chuck admitted they were in trouble because they had robbed and shot some people

in Kentucky. Mike used the pistol; Chuck used a lug-wrench.

At a tavern in Tavares, Florida, Chuck told his father that "he got even with the old bitch (his step-grandmother) . . . that he couldn't do Grandpa and he took care of the old bitch . . . Mike said he shot the old man point blank in the head." Chuck and Mike admitted taking four or five hundred dollars in the murder and robbery.

The testimony of George Darnell, Chuck's grandpa who survived the ordeal, sealed the fate of Chuck and Mike. He testified that shortly after he and Hattie went to bed, "somebody come and knocked on the door . . . Chuckie, my grandson, told me who he was . . . Hattie got up and opened the door . . . one of them said his name was Nickels . . . he (Mike) asked me how much money I had . . . he said if I had enough money he might let me live . . . and I passed out." Before George became unconscious, he heard shots in the room where Hattie was. He had four or five hundred dollars in his pants pocket. He was shot in the right eye. He testified positively that "Chuckie" and Mike were the only persons there the night these sordid crimes were committed.

There is an abundance of evidence contained in seven volumes. This court is of the opinion, however, that the evidence recited is sufficient to dispose of the issues. Reference to other evidence will be made if necessary to resolve any of the points raised on appeal.

Chuck and Mike first contend that on three occasions the prosecutor attempted to impeach their testimony by commenting on their silence at the time of arrest. During the direct examination of Pat R. Kickliter, the Florida officer who arrested them, the prosecutor asked if either made any statements after being advised of their constitutional rights. Kickliter replied "no." Chuck's and Mike's counsel promptly objected and moved for a mistrial. The motion was overruled but the jury was given an admonition. Mike Nickel was asked on cross-examination if he had said, after being advised of his rights, "Me and this other fellow . . . (nodding to Charles Darnell) . . . have nothing to say. We want a lawyer." An objection was made. Another motion for mistrial was sought. It was also overruled.

Officer Kickliter was recalled for rebuttal testimony. He testified he first met Mike on the night of June 10, 1976. The following question was asked:

"I'll ask you, at that time, he made this statement to you in form or substance: 'Me and this other man'—pointing to Charles Darnell, 'have nothing to say. We want a lawyer.' The officer replied: 'Yes, sir.' "

Chuck and Mike rely on *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), for the proposition that the use of their silence after arrest for impeachment purposes violates due process. They suggest that the prosecutor was attempting to convey the message that innocent men would have talked rather than remained silent. In *Doyle,* supra, the U. S. Supreme Court held that due process was abridged where the prosecutor asked the defendants in a series of questions why they had remained silent after their arrest. In *Doyle,* supra, the court stated:

"We hold that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment. *The State has not claimed that such use in the circumstances of this case might have been harmless error.* Accordingly, petitioners' convictions are reversed and their causes remanded . . . .." (Emphasis added).

A majority of this court is of the opinion that the three isolated questions here constitute only harmless error which does not require reversal, *cf. Niemeyer v. Commonwealth,* Ky., 533 S.W.2d 218 (1976).

A reversible error under the *Doyle* rule would arise if the prosecutor's remarks or questions focused on Chuck's and Mike's silence so as to strike at the heart of their

defense. In this case, the prosecutor did not focus on their silence by repetitive questioning, nor did he mention it in his closing argument. Secondly, the answer which was obtained was that they desired the services of an attorney before making a statement. Thus, an inference of guilt was negated by the explanation of their silence. Finally, the evidence against Chuck and Mike was overwhelming. Thus, the error, if any, was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

The next assertion of error is that the trial court erred in permitting the introduction in evidence, of the testimony of Mrs. Robinson.

Mrs. Robinson, a neighbor, testified that, at about 11:00 P.M. on June 8, three men walked past her window. She could not identify them but heard one referred to as Chuck. She recounted that one of the men said, "Your blanking ass ain't no better than mine rotting in jail." Chuck's and Mike's counsel objected to her testimony since she didn't know who made the statements. They now argue that this statement was inadmissible hearsay and highly prejudicial since the obvious inference was that the speaker and listener were contemplating criminal activity. They also contend this testimony deprives them of their right to confront and cross-examine a witness.

■ Whether Mrs. Robinson's testimony should have been admitted depends upon whether it proves or disproves a material fact. In answer to this question, the relevancy of this testimony is clearly established by Chuck and Mike in their briefs:

"The obvious inference of the remark was that the speaker and the listener were contemplating activity that could result in their being incarcerated. Since Darnell was allegedly one of the three men who walked past Mrs. Robinson's window, the jury could have concluded he was either the speaker or the listener and disbelieved the exculpatory testimony he gave at trial. Moreover, Mrs. Robinson's testimony that appellant Nickel was in the back yard with appellant Darnell most probably conveyed to the jury that appellant Nickel was one of the three men who walked past her window."

Inasmuch as her evidence tended to establish the existence of a criminal act, Mrs. Robinson's testimony was relevant. Therefore, the evidence was properly admitted over an objection that it lacked relevance. The statement complained of is not hearsay because it was not introduced to prove the truth of its contents. Instead, it was properly admitted as a verbal act and a relevant part of the events observed. *Armstrong v. Commonwealth*, Ky., 517 S.W.2d 233 (1974).

■ Chuck and Mike desired additional time in which to examine the results of the tests on their blood. They also wanted to confer with independent experts and to subpoena the persons who prepared the reports. Whether this reason is sufficient to justify granting the requested continuance is a matter to be determined by the trial court in the exercise of its discretion, *cf. Benge v. Commonwealth*, Ky., 346 S.W.2d 311, 314 (1961). It is this court's view that the denial of the motion for a continuance did not constitute an abuse of discretion.

"A continuance or recess should not be granted the opposing side each time an expert testifies on the ground that it will take time to produce a counterexpert." *Brawner v. Commonwealth*, Ky., 344 S.W.2d 833, 836 (1961).

Conceding for purposes of the argument that it was an error for the trial court not to grant a continuance so that Chuck and Mike had time in which to obtain an independent blood analysis, it appears to this court that there was nothing to prevent their doing so while the trial was in progress, or as soon thereafter as possible, in order to make a showing that they had been prejudiced. For example, if they had promptly done so, and if the independent analysis had proved inconsistent with the one introduced by the Commonwealth, a motion for new trial based on an affidavit disclosing that fact would have sufficed to show that they had been prejudiced. When

defendants claiming prejudicial error have an opportunity to produce the facts that show whether in fact they had been prejudiced, but instead sit on their hands and do nothing, they cannot expect this court to presume the prejudice.

■ The trial court properly refused to admonish the jury as to the probative value of a co-indictee's testimony.

Before Anthony Darnell testified, Chuck and Mike moved the court to admonish the jury that his testimony might be influenced by the charges pending against him. This was denied and they allege this to be error. They also requested that the trial judge instruct the jury to determine whether Anthony was an accomplice. A further instruction that an accomplice's testimony must be corroborated was also requested. Both instructions were denied.

Chuck and Mike recognize that the mere fact that one is indicted with another does not make him an accomplice. *Fox v. Commonwealth*, 248 Ky. 466, 58 S.W.2d 608 (1933). They suggest, however, that the fact one is a co-indictee indicates a potential for falsification which is the same policy rationale for requiring the above instructions where an accomplice testifies.

■ A witness' expectation of a benefit or motive to testify falsely is a factor that goes to the credibility of the witness and to the weight of his testimony. Such matters are within the scope of the jury's duty. *Jones v. Commonwealth*, 313 Ky. 827, 233 S.W.2d 1007 (1950).

The isolated reference to Frances Darnell's testimony before the grand jury was not error. Frances Darnell, Chuck's mother, testified that Anthony left her house at about 11:00 or 11:30 P.M. on June 8. On cross-examination, the prosecutor asked if she told the grand jury that Anthony never left after 10:00 P.M. Mrs. Darnell answered that she could not recall that statement. Chuck and Mike argue that by failing to introduce further evidence of the prior inconsistent statement, the Commonwealth improperly attempted to impeach Mrs. Darnell's testimony. It would have been prop-

er, in their view, if some evidence of the grand jury proceedings were offered.

■ The prosecution has the right to cross-examine a witness as to inconsistent statements in a prior proceeding in order to impeach his credibility. This court has found no authority for the proposition that the failure of the impeaching party to prove that the witness made a prior inconsistent statement is a denial of the right of confrontation. None has been cited by Chuck or Mike in the prosecution of their appeal.

■ On September 27, counsel for Anthony Darnell moved for a psychiatric examination of Anthony to determine his competence to stand trial, as well as his competence at the time of the crime. The motion was denied. Chuck and Mike now urge that the motion raised a doubt as to Anthony's competence as a witness. They insist this placed a duty on the trial court to hold a hearing, *sua sponte*, on Anthony's competence to testify. *Whitehead v. Stith*, 268 Ky. 703, 105 S.W.2d 834 (1937). They contend that since Anthony was a major prosecution witness, his competency was crucial to a fair trial. It is also argued that Anthony's possible incompetence to testify denied them their rights of confrontation and cross-examination.

*Whitehead*, supra, is not in point. There the witness was a child of tender years who testified he did not know what it meant to tell the truth. No such manifest signs of Anthony's incompetence were present in this case. In *Whitehead*, supra, an objection was made. Here no objection to Anthony's testimony was made and, therefore, there was no error.

This court is convinced that Chuck and Mike ought to be content and go on their way rejoicing because the indictment was amended to show a Class A Felony, rather than a Capital offense. Had Kentucky's Death Penalty Statute not have been declared unconstitutional, under the evidence in this case, they may have received the extreme penalty of death.

The trial court failed to follow the mandatory pre-sentencing procedures imple-

mented in the Kentucky Penal Code. KRS 532.050; *Brewer v. Commonwealth*, Ky., 550 S.W.2d 474 (1977).

The judgments as to Chuck and Mike are affirmed. However, the judgments entered upon the jury verdicts as to each of them are now vacated and the case is remanded to the Greenup Circuit Court for resentencing pursuant to the provisions of KRS 532.-050 and *Brewer*, supra.

All concur except LUKOWSKY, J., who dissents and files a separate dissenting opinion.

LUKOWSKY, Justice, dissenting.

My noble and learned confreres have once again countenanced the impeachment of the exculpatory stories of defendants, told for the first time at trial, by direct evidence of and cross examination about their failure to tell these stories after receiving "Miranda" warnings at the time of arrest. They find the justification for this result in the harmless error rule enunciated in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) and applied in *Niemeyer v. Commonwealth*, Ky., 533 S.W.2d 218 (1976). I respectfully dissent.

Our opinion in "Niemeyer" was rendered on February 6, 1976. In unequivocal language, it holds that it is error to admit this type of evidence. In equally strong language, it points out that it is the duty of the Commonwealth Attorney to prosecute not persecute and cautions prosecutors against the use of such evidence. On the basis of overwhelming evidence and rationality of penalty, we found the error to be harmless beyond a reasonable doubt.

Since our decision in "Niemeyer" we have seen a parade of cases in which this error has reared its ugly head. Some of these cases have been reversed on other grounds. Others have been affirmed by application of the harmless error principle or because the error was not properly preserved for appellate review. Having seen the same error pass in review so many times, I am compelled to conclude that prosecutors are deliberately disregarding the teaching of "Niemeyer" in the hope of finding salvation in the harmless error doctrine. In other words, they are more interested in obtaining a conviction than in obtaining a conviction that will stick.

It may well be that we fathered this attitude when we failed to reverse "Niemeyer". We provided the tightrope of harmless error and perhaps that was enough to encourage zealots to walk it. However, one would have thought that their ardor would have been substantially dampened on June 17, 1976 when the Supreme Court of the United States delivered its opinion in *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91, in which it was held that the use of post arrest silence in this manner violated due process.

This case did not go to trial until October 4, 1976. By that time the bench and bar should have gotten the message of "Niemeyer" and "Doyle" and avoided this error like the plague. Apparently such is not the case.

It seems to me that to approach this problem on a case by case basis by hopefully precise but sometimes nebulous characterization of error as either harmless or prejudicial is but to encourage the commission of such error. The time has come for us to take a more prophylactic approach. We should exercise our supervisory authority over the lower courts of Kentucky and hold that whenever this error is committed it will result in reversal and a new trial. If that should prove to be insufficient to eliminate this form of gamesmanship we should assess the costs of appeal and the new trial against the Commonwealth Attorney.

For the reasons given, I would reverse the judgment of the Greenup Circuit Court and remand the case for a new trial.