## Commonwealth v. Eckman

*Laurence Harmelin, assistant district attorney,* for the Commonwealth.

*J. Graham Andes,* for defendant.

WOOD, *J.,* September 24, 1985—On July 20, 1984, a jury found defendant Roxanne Eckman guilty of voluntary manslaughter and acquitted her on charges of first- and third-degree murder. Before

us are her post-trial motions for arrest of judgment and for a new trial.

Decedent Billy Donkewicz and Roxanne had been girlfriend and boyfriend for approximately six years prior to Billy's death on January 30, 1984. The couple had had three children together, the first being born when Roxanne was only 15 years of age. Billy was 25 on the date of his death. The relationship was a stormy one, to say the least, with each party inflicting physical injury on the other on numerous occasions. Many times the police became involved, occasionally arresting one or the other for various minor offenses.

What proved to be the last such domestic quarrel began after dinner on the evening of January 30, 1984. Billy and Roxanne had another argument and, as a result, Roxanne packed Billy's clothes in trash bags and ordered him out of their apartment. Billy left and went to spend the night with his brother, George, who had an apartment on the second floor of the same building.

Shortly after Billy lay down to go to sleep at his brother's; Roxanne came up the steps to the second floor and knocked on George's door. George initially told Roxanne that Billy was asleep, but Billy consented to talk with her and went out into the second floor hallway to do so. Approximately three to five minutes later, George heard a thump at his door and saw his brother fall into the apartment, holding his chest and stating that "she just stabbed me." Billy died shortly thereafter.

Roxanne was arrested in her apartment sometime between 12:15 and 12:30 a.m. on assault charges and was read her Miranda rights. About an hour later, after it had been determined that Billy was dead, she was re-read her Miranda rights and informed that she was now being charged with crimi-

nal homicide. She was then taken to the Coatesville Police station for processing and again reminded of her right to remain silent. At this point, John Crane, Esq., a deputy district attorney, appeared on the scene and suggested that Roxanne be taken to Brandywine Hospital to check for signs of injury. The doctor at Brandywine found no bruises or fresh injuries on any part of her body nor did Roxanne complain that she had been injured in any way.

At trial Roxanne admitted that she stabbed Billy, but said she did so because she felt that she was in imminent danger of death or serious bodily injury. Her belief was based on the long history of abuse which she had suffered at Billy's hands. She also claimed that Billy was assaulting her again just prior to the stabbing. She says he had hold of her hair and twisted her neck, causing excruciating pain.

During trial, the Commonwealth sought to make an issue of the fact that Roxanne showed no signs and made no complaints of pain or injury while she was at the Emergency Room. Perhaps anticipating that the jury itself might wonder why she didn't complain, defense counsel touched on the subject in his questioning,[1] but objected when the Commonwealth's attorney got into the same area on cross. At side bar, we informed counsel that we would permit cross-examination on the point, but that the Commonwealth's attorney could not refer

---

1. From Roxanne's direct testimony, N.T. 517:

"Q. Why didn't you say anything to the doctor?

"A. I was upset and afraid still.

"Q. And had they told you that you didn't have to say anything; you could keep quiet?

"A. Yes.

"Q. And did you decide to keep quiet?

"A. Yes."

to Roxanne's silence in his closing argument. Specifically we stated:

"The Court: All right. I am going to rule that Mr. Harmelin may continue along this line of questioning, because it was brought out on direct examination that she remained silent at the doctor's and why she remained silent. I will permit him to explore what might have been said or not said, and the reasons for saying or no saying.

"I will say this, however. I cannot permit you to argue in your arguments that any adverse inference should be drawn if she chose to remain silent. I can't permit that, but I can permit you to cross-examine her on what happened at the examination by the doctor and why she may or may not have said this or that.

"Mr. Harmelin: Is the court telling me that in summation I cannot argue that if she was hurt it would make sense she would say that she had pain if she was asked?

"The Court: No. I will not, I will not permit you to argue that, because she chose — I will not permit you to argue. She didn't say anything that shows a consciousness of guilt that can be used as adversely to her.

"Mr. Harmelin: I understand. . . ."

Despite our explicit instructions to the contrary, in his closing argument the district attorney made the following references to defendant's post-arrest silence during her examination at the hospital: "Ladies and gentlemen, you should use your common sense and think about, if she was in such great pain from having her neck pulled, and Dr. Cinco said does it hurt anywhere, that common sense would have dictated that she said it was or would hurt." After an objection by defense counsel, the district attorney continued, "Did the doctor say there was

complaints of pain in the neck? No." Again defense counsel objected. We overruled the objections and gave no cautionary instruction with respect to any of the references to defendant's post-arrest silence made either during the course of the district attorney's direct examination or during his closing argument. Since Roxanne was asserting self-defense, she claims that these references to her post-arrest silence, made in order to raise an inference that she was not injured and that, therefore, her actions could not have been in self-defense, violated her Fifth Amendment right to silence. On reflection, we are constrained to agree.

It is a clear violation of an accused's constitutional right against self-incrimination to make a reference at trial to his silence while in police custody. Commonwealth v. Gbur, 327 Pa. Super. 18, 474 A.2d 1151 (1984). It is well settled that the admission of an accused's silence after his arrest is reversible error. Commonwealth v. Anderjack, 271 Pa. Super. 334, 413 A.2d 693 (1979). Although in certain circumstances such error may be cured by a cautionary instruction, Commonwealth v. Maloney, 469 Pa. 342, 365 A.2d 1237 (1976), we gave none. Moreover, in a case such as this, where the district attorney deliberately exploited the accused's silence, we doubt that the prejudicial effect could have been remedied by cautionary instructions. Com. v. Turner, 499 Pa. 579, 454 A.2d 537 (1982).[2] Our Supreme Court has stated:

_____

2. There is a line of cases which indicate that where an accused chooses to exercise his right to silence, and the Commonwealth impermissibly argues that an adverse inference may be drawn, the error may be cured by cautionary instructions: see, e.g., Com. v. Bey, 294 Pa. Super. 229, 439 A.2d 1175 (1982); cf. U.S. v. Fairchild, 505 F.2d 1378 (1975); and see also Com. v. Easley, 483 Pa. 337, 396 A.2d 1198 (1979)

"The prejudice to defendant resulting from reference to his silence is substantial. While it is efficacious for the Commonwealth to attempt to uncover a fabricated version of events, in light of the insolubly ambiguous nature of silence on the part of the accused, Doyle v. Ohio, 426 U.S. 610, 617, 96 S.Ct. 2240, 2244, 49 L.Ed.2d 91, 97 (1976), we do not think it sufficiently probative of an inconsistency with his in court testimony to warrant allowance of any reference at trial to the silence. Accordingly, the Commonwealth must seek to impeach a defendant's relation of events by reference only to inconsistencies as they factually exist, not to the purported inconsistency between silence at arrest and testimony at trial. Silence at the time of arrest may become a factual inconsistency in the face of an assertion by the accused while testifying at trial that he related this version to the police at the time of arrest when in fact he remained silent. Doyle v. Ohio, Id. at 619, n. 11, 96 S.Ct. at 2245, n. 11, 49 L.Ed.2d at 98, n. 11. Absent such an assertion, the reference by the prosecutor to previous silence is impermissible and reversible error." Turner, supra, at 539-40.

Although the question is close, we conclude that counsel's argument intruded impermissibly on Roxanne's rights. We will not bar retrial, however. The Commonwealth attorney's actions, under the circumstances, do not constitute overreaching: Cf. Com. v. Redel, 335 Pa. Super. 354, 484 A.2d 171, 176 (1984). Instead, we will order a new trial.

---

(failure to give cautionary instructions is reversible error) and Com. v. Sanders, 324 Pa. Super. 372, 471 A.2d 885 (1984) (Court's questioning impermissibly raises adverse inference). In this case, as noted, we gave no such instructions.

Having awarded a new trial, it may be helpful in the proceedings to come to comment on other matters raised by the defense.

The defense contends that we committed reversible error in refusing to allow expert testimony on the classic "abuse cycle" of the battered women's syndrome. Defendant was prepared to call Delois Y. Newton, acting director of Project Together, for that purpose. Even assuming that Ms. Newton, who had a Bachelor of Arts degree in Elementary Education and Special Education and 12 years of practical experience as a social worker, qualified as an expert for purposes of giving the proposed testimony at trial, her proposed testimony was offered in a vacuum and not tied in to defendant's state of mind at the time of the killing. Defense counsel made the following offer of proof:

"Finally, I'm going to ask her after her qualifications as a social worker or worker and experienced social worker, if she has any experience with abused women and family abuse. And once having qualified her, it would be my intention to have her describe the classic abuse cycle, which tends to show why women, in general, and women like the defendant, stay with men that are abusing them, even though they are receiving this physical abuse."

Defendant relies on State v. Kelly, 97 N.J. 178, 478 A.2d 364 (1984), to show that this testimony is relevant. In that case, however, the expert was prepared, not only to give testimony on the abuse cycle in general, but to give her opinion that defendant was a battered woman and subject to the battered woman's syndrome. She was also prepared to testify as to how defendant, as a battered woman, perceived her situation at the time she stabbed her boyfriend. Here, defendant's offer did not include any connection between the battered woman's syn-

drome and this defendant's mental state at the time of the stabbing. General testimony on the battered woman's syndrome and the abuse cycle, which is not tied in to defendant's state of mind at the time of the actual killing, is irrelevant. See Commonwealth v. Jessie Bell Grove (Chester Cty., 1985).

Roxanne also asserts that we should have suppressed her statements which were made after her Miranda rights had been read, because she was not adequately informed of the general nature of the charges against her: Commonwealth v. Richman, 458 Pa. 167, 175, 320 A.2d 351 (1974). At the time she made the statements she was told that she was being arrested "for the assault which took place upstairs." At that point, Billy's death had not yet been confirmed. In Commonwealth v. Reaves, 279 Pa. Super. 581, 586, 421 A.2d 351, 354 (1980), the Superior Court observed:

"Dixon, supra, therefore, stands for the proposition that an accused must be aware of the *nature* of the investigation at the time of the questioning before a waiver of Miranda rights can be held to be effective. It does not mean that an accused must be aware of all the consequences which might flow from a waiver of his Miranda rights before he can effectively waive them. A suspect, therefore, need not have knowledge of the 'technicalities' of the criminal offense involved; rather, it is necessary only that he be aware of the 'transaction' involved. Commonwealth v. Dixon, supra; Commonwealth v. Richman, 458 Pa. 167, 320 A.2d 351 (1974). We also hold that a defendant need not be aware of every conceivable consequence which might flow from a waiver of his Miranda rights in order to effectuate such a waiver as it is impossible to foresee every such possible consequence. We merely hold that the defendant must be informed that his state-

ments can and will be used against him in a court of law as required in Miranda." Quoted in Commonwealth v. Gotto, 306 Pa. Super. 434, 452 A.2d. 803, 807 (1982). Here, defendant was made aware of the incident which the police were investigating when she made the statements which she sought to suppress at the time of trial.

Defendant also contends that our charge was so confusing to the jury that she was denied a fair trial. In light of our decision to grant her a new trial, this complaint becomes academic. She also complains that we improperly failed to admit a prior consonant statement. The admissibility of that statement in a future trial will depend on the circumstances existing at the time of its offer.

Accordingly, we enter the following

### ORDER

And now, this September 24, 1985, after argument and upon review of the record and briefs, defendant's post-trial motion for a new trial is granted.

The court administrator shall relist the matter for trial consistent with the court's business and the requirements of law.