**UNITED STATES**

v.

**Gerald T. FRENTZ, 549 58 7541**
**Lieutenant (O-3), U.S. Navy.**

**No. NMCM 85 0510.**

U.S. Navy-Marine Corps Court of Military Review.

Oct. 7, 1985.

Lt J. Cunyon Gordon, JAGC, USN, Appellate Defense Counsel.

LCDR David A. Sabot, JAGC, USN, Appellate Government Counsel.

Before KERCHEVAL, Senior Judge, and RAPP and GRANT, JJ.

GRANT, Judge:

Contrary to his pleas, appellant was convicted at a general court-martial of stealing a Wang "System Five" Word Processor (System 5), government property, valued at $6,900.00, in violation of Article 121, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 921. The sentence extended to a dismissal from the Naval Service which was approved by the convening authority.

Three errors were assigned by appellate defense counsel, namely, (1) the trial judge erred by failing to ascertain on the record that appellant knowingly and voluntarily waived his rights under Article 32, UCMJ; (2) the trial judge erred by allowing the Government to introduce evidence that appellant invoked his right to remain silent and his right to consult with an attorney; and (3) the Government failed to prove beyond a reasonable doubt that appellant stole government property on or about 29 July 1983. In a post-trial affidavit, the appellant raises the issue of ineffective assistance of counsel, alleging that his trial

defense counsel did not advise him of his rights at an Article 32 Investigation. Upon carefully examining the errors raised, the applicable evidence, and counsel's arguments, we conclude that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed.

I

■ An Article 32 Investigation is not a mere formality, but rather a substantial right afforded a military accused ultimately facing trial by general court-martial, and as such has come to be regarded as an integral part of the court-martial proceedings. *See United States v. Wager,* 10 M.J. 546 (N.C.M.R.1980). However, it is well established that an accused can knowingly and deliberately waive the right to an Article 32 Investigation. *United States v. Nichols,* 8 U.S.C.M.A. 119, 23 C.M.R. 343 (1957). We believe that the "knowing and deliberate" requirement in appellant's waiver was satisfied where the appellant on the record, in the presence of detailed defense counsel, acknowledged he was advised of his Article 32 rights by his counsel and knew what he was doing, in the absence of any evidence of record which would belie the truth of the appellant's assertions.

In arriving at this conclusion, we are aware of the requirement prescribed in *United States v. Care,* 18 U.S.C.M.A. 535, 40 C.M.R. 247 (1969), and *United States v. Donohew,* 18 U.S.C.M.A. 149, 39 C.M.R. 149 (1969), involving the waiver of constitutional and important statutory rights, respectively. However, both mirror the rationale set forth in *Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), that requires the trial judge personally to establish a factual predicate, on the record, establishing the knowing and voluntary character of an accused's waiver of constitutional rights that directly impact upon guilt and punishment. Although an Article 32 Investigation is a substantial statutory right, the *Boykin* rationale, as

applied in *Care* and *Donohew,* is not applicable in the case *sub judice.* An Article 32 Investigation is designed primarily as an investigatory tool to determine the existence and disposition of an offense and only indirectly impacts upon guilt and punishment. Under the circumstances of this case where the appellant acknowledged in court, in the presence of counsel, that he was advised of his Article 32 rights and chose to waive such rights, no more is required to satisfy due process requirements, in the absence of evidence of record indicating that appellant was not so advised, which would require the trial judge personally to establish a factual predicate under the plain error rationale of *United States v. Baxter,* 2 M.J. 610 (N.C.M.R. 1977), in determining whether such rights were knowingly and deliberately waived.

■ Neither do we perceive that a legitimate issue of ineffectiveness of counsel was raised in appellant's post-trial statement alleging that his detailed defense counsel did not properly advise him of the full panoply of rights he could exercise at an Article 32 Investigation where the appellant's acknowledgement on the record in the presence of the trial judge contradicts his post-trial statement, his assigned counsel's post-trial affidavit corroborates the appellant's in-court representations, tactical considerations clearly underpin appellant's decision to waive the Article 32 Investigation, and the record of trial demonstrates appellant's propensity to play fast and free with the truth when he perceives it to be to his advantage. *United States v. Leslie,* 13 M.J. 871 (N.M.C.M.R.1982), *pet. denied,* 15 M.J. 56 (C.M.A.1982). Ironically, the appellant's post-trial assertion that he was not properly advised of his rights under Article 32 flies in the face of his third assignment of error, which has its genesis in appellant's tactical decision to forgo the Article 32 Investigation in order not to alert the Government to a material variance between its proof and the charge that would ostensibly benefit the Government if detected before trial. We simply do not believe the appellant can have it both ways.

## II

▮ It is a well established general principle of law that the Government may not bring to the attention of the triers of fact that an accused invoked the right to remain silent and consult with an attorney prior to being interrogated, *United States v. Moore*, 1 M.J. 390 (C.M.A.1976), because the untrained court-member may equate the accused's invocation of rights to a conclusion of guilt. However, there is an equally well recognized exception to the rule where the Government introduces evidence of the prior invocation of rights not to impeach the accused's exculpatory story at trial, but rather to challenge the testimony of the accused at trial in regard to pretrial behavior which is materially inconsistent with the accused's in-court assertions. *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), citing *United States v. Fairchild*, 505 F.2d 1378 (5th Cir.1975). Each case requires an examination of the facts in light of the *Doyle* rationale.

In the case *sub judice*, Naval Investigative Service Special Agent Archie G testified in the Government's case-in-chief that he was assigned to investigate the theft of the System 5 and on 31 January 1984 approached the appellant, whom he suspected of the theft based upon conversations with persons assigned to the Officer in Charge Construction Diego Garcia, in Houston, Texas (OICC), under the Naval Facilities Engineering Command. The System 5 was discovered missing during the latter part of 1983 after the appellant reported on 1 August 1983 to Texas A&M University for post-graduate studies. During the course of the interview, appellant calmly and sincerely indicated that he sent the System 5 to Manila at a time when he was attached to the OICC in the course of his duties, and that he subsequently rented a System 5 which he was using in connection with his present military duties as a post-graduate student at Texas A&M University. Returning the following day to continue the interview, Agent G advised the appellant he was not able to corroborate the appellant's story, at which time the appellant invoked his right to remain silent for the purpose of talking to a Navy lawyer, and also denied Agent G permission to search his residence or office spaces at Texas A&M University after being advised of his fourth amendment rights. The appellant further requested to withdraw his previous statement. Agent G then contacted Lieutenant Jerry C, Naval Science Instructor, at Texas A&M University, who introduced Agent G to Lieutenant Mark S and Mr. Michael H, both of whom shared office space with the appellant at the University. There Agent G found part of the System 5 and conducted interviews with Lieutenant S and Mr. H. On 2 February 1984 Agent G received a phone call from Lieutenant C to the effect that appellant turned in the other components of the System 5 and that appellant had a prepared statement for Agent G. On 3 February 1984, Agent G received custody of the remaining components of the System 5 from Lieutenant C.

Prior to Agent G's direct testimony in the government's case-in-chief, Lieutenant S and Mr. H both testified that appellant represented the System 5 to have been his personal property; that he purchased it for use at Texas A&M University for $8,000.00; and that the appellant introduced the System 5 into the office space during late September or early October 1983. Lieutenant C testified that Agent G seized part of the System 5 during his initial visit, and the following day the appellant appeared with the remainder of the system. Testimony was also provided by Captain d.V, who was the appellant's Officer in Charge at OICC that it was not probable that he, Captain d.V, ever gave the appellant permission to take the System 5 to his home to work on government projects during surge periods or that he authorized the appellant to take with him the System 5 to Texas A&M University. However, Captain d.V did not believe, under the circumstances, it was inappropriate for the OICC to have purchased the System 5, and that the appellant in carrying out his duties had the authority to authorize the purchase of this kind of equipment. Other

evidence of record offered by the Government in its case-in-chief confirmed that appellant authorized the purchase of the System 5 in early 1983; Lieutenant Barry S, the appellant's successor at OICC, sighted the System 5 in appellant's home during the first part of July 1983; Ms. Elna K, Manager, Word Processing System, OICC, testified that when confronted with the missing System 5 after having detached from the OICC, the appellant initially stated he sent the system to Manila before he detached but later suggested to write it off as lost property; Ms. Peggy Lee B, Secretary for the OICC, stated that she sighted the System 5 in the appellant's home during April or May 1983, at a time when she was babysitting for the appellant, who indicated at the time he either purchased it or got it with the help of the Government.

Consequently, at the time the Government offered the testimony of Agent G, during its case-in-chief, the appellant well knew that a successful defense depended upon convincing the triers of fact that the purchase and removal of the System 5 from OICC was authorized and that those testifying against him were either lying, mistaken, or their testimony could be explained by the appellant. The groundwork for such a defense was laid in the appellant's opening statement, where he alluded to his invocation of Article 31, 10 U.S.C. § 831 rights in order to gain time to speak with a Navy attorney for the purpose of clearing up the misunderstanding. He vigorously pursued his theory of the case through cross-examination of government witnesses in an attempt to convince the triers of fact that the accusations against him were primarily the result of a misunderstanding from the very beginning.

During the cross-examination of Agent G, the appellant attempted to portray Agent G as in a hurry to return to his residence during his initial interrogation of the appellant, and further actively solicited from Agent G information to the effect that the appellant did not at the first meeting invoke his right to remain silent. The appellant cross-examined Agent G in regard to the appellant's subsequent invocation of rights at the follow-up meeting, but that appellant ultimately gave Agent G a sworn statement. The appellant's cross-examination of Agent G set the stage for his own testimony in the defense case-in-chief, in regard to his theory of the case pertaining to the alleged misunderstanding. The appellant explained that he lied during the first meeting with Agent G because he panicked upon learning he was a suspect and wanted to get rid of Agent G so that he could speak with an attorney and clear up the misunderstanding. Following the initial interview, the appellant alleged he intended to make a full disclosure to government officials and to return the property to prove his good intentions. He invoked his right to remain silent and requested to withdraw his prior statement to Agent G upon the advice of a non-lawyer at the Naval Legal Service Office. Appellant finally indicated that after he had the opportunity to speak to a lawyer, he gave up the remaining components of the System 5 that had not been seized by Agent G and made a statement which he provided to Agent G. The appellant opined that Captain d.V was under stress at the time and was mistaken about not giving him authorization to take home the System 5 and to transfer it to Texas A&M University for post-graduate studies; denied suggesting to Ms. Peggy Lee B that he purchased the System 5 with his own money; denied telling Lieutenant S and Mr. H that the System 5 was his own and that he purchased it for $8,000.00; asserted that in his conversation with Ms. K in regard to writing off as a loss the System 5, he believed Ms. K was talking about a System 5 different from the one he had at Texas A&M University; and presented the testimony of Ms. Rebecca F, and Mr. Jesse R, both involved in the process of purchasing word processors, and his wife Ms. Carole Frentz, together with substantial evidence of good character and trustworthiness, to corroborate his claim that Captain d.V had given him permission to purchase the equipment and to take it with him.

Given the sequence of events in the Government's case-in-chief, we have serious doubts that the evidence of appellant's invocation of rights during subsequent interviews by Agent G was admissible for purposes of establishing an "explanation for prior inconsistent statements executed by appellant close in time before and after his transitory assertion of silence," as is alleged by government appellate counsel. During the Government's case-in-chief, there were no materially inconsistent statements of the appellant offered into evidence, only the appellant's request to retract his initial statement to Agent G. Whatever statement the appellant provided Agent G during their final meeting was not introduced by the Government in its case-in-chief.

■ However inadmissible such evidence may have been upon proper objection at the time it was offered, such evidence is only excludable as a shield against utilizing the appellant's invocation of rights against him. *See United States v. Fairchild*, 505 F.2d 1378. Given the appellant's opening statement in which he specifically addressed the invocation of rights and his cross-examination of witnesses during the Government's case-in-chief, it was obvious that he intended to use his own invocation of rights as a sword in his own defense to establish credibility and explain his admitted falsehood to Agent G. His testimony during the defense case-in-chief confirms the appellant's intentions. Even if the trial judge's failure to *sua sponte* exclude evidence of the appellant's invocation of rights during the Government's case-in-chief constitutes error of the magnitude described in our decision in *United States v. Waage*, No. 84 1969 (N.M.C.M.R. 30 January 1985) (unpublished), we are convinced beyond a reasonable doubt that such error is harmless to the appellant, where the appellant during his case-in-chief presented a defense premised, in part, upon explaining his invocation of rights in an attempt to gain credibility with the trier of fact, made no objection at trial to the proffered evidence during the Government's case-in-chief, and neither claimed at trial nor upon appellate review that he was induced to testify and explain his invocation of rights because of the potentially prejudicial impact of not answering the Government's evidence pertaining to his invocation of rights. In a word, this court is unwilling to underwrite a calculated gamble of the appellant, conceived as part of the appellant's theory of the case from the outset and fully litigated before the triers of fact, which fell upon deaf ears.

Although the appellate defense counsel did not certify as error the Government's introduction of evidence in its case-in-chief in regard to the appellant's invocation of his fourth amendment rights, we believe the same rationale as indicated herein is applicable.

### III

■ Clearly, an accused cannot be convicted of a crime different from that charged. *United States v. Wray*, 17 M.J. 375 (C.M.A.1984). The appellant's argument is premised upon the theory that he could have been convicted only of a withholding type larceny, on or about 29 July 1983, but that the Government's evidence, at best, proved a separate, uncharged larcenous taking during the early part of 1983. We disagree.

■ The appellant's testimony itself raised the issue of a larcenous withholding on or about 29 July 1983, when considered in light of the entire evidence of record. The record supports the findings of the triers of fact that the appellant could have rightfully authorized the purchase of and lawfully possessed the System 5 in early 1983 or at least honestly believed he had such authority, which is not inconsistent with Captain d.V's testimony that it was not probable that he authorized the appellant to take home the System 5 for purposes of working on government projects or to Texas A&M University to utilize in connection with the appellant's post-graduate studies. The triers of fact obviously gave the appellant the benefit of any reasonable doubt regarding any honest mis-

taken belief that he could use the System 5 at home given the fact that he ostensibly employed the System 5 to supplement the needs of the OICC during surge periods, but could no longer accept the appellant's version of events once the appellant officially joined Texas A&M University, on 1 August 1983, given the testimony of Lieutenant S, Mr. H, and Agent G, to whom the appellant made statements so inconsistent with his innocence as to defy belief.

Unlike the case of *United States v. Wray,* where the triers of fact determined that the subject of the larceny was abandoned before the accused came into its possession thereby raising the issue of a separate larceny committed by a person other than the appellant, the case *sub judice* does not raise the specter of a second offense not charged. Rather, the facts which gird the findings of the triers of fact clearly support the proposition that there was but one larceny, a withholding type, charged and committed on or about 29 July 1983, just before the appellant joined Texas A&M University for post-graduate studies. The fact that the triers of fact found the offense occurred at Naval Facilities Engineering Command, Contract, Diego Garcia, in Houston, Texas, is not inherently inconsistent with a withholding type larceny on 29 July 1983, as the System 5 apparently had not been removed from the appellant's home at the time and was constructively a part of the command given the fact that it had been utilized at the appellant's home as an extension of the appellant's work place at OICC.

We conclude that the evidence of record supports the findings of the triers of fact beyond a reasonable doubt, that the offense occurred on or about 29 July 1983, as charged, and that the appellant committed the offense by a larcenous withholding of the System 5 at a time when he was in a fiduciary relationship to the Government and responsible for ensuring the System 5 was properly safeguarded and returned to the command.

Accordingly, we affirm the findings of guilty and sentence as approved on review below.

Senior Judge KERCHEVAL and Judge RAPP concur.