IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 11, 2000

## STATE OF TENNESSEE v. DARONOPOLIS R. SWEATT

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 38944     John H. Gasaway, III, Judge**

---

**No. M1999-2522-CCA-R3-CD Filed November 3, 2000**

---

The defendant was convicted of first degree felony murder and aggravated robbery. He was given a life sentence for the murder conviction, and eleven years for the robbery conviction, with the robbery sentence to be served consecutively to the life sentence. The defendant appeals his convictions and sentencing, arguing that: 1) the State failed to prove venue by a preponderance of the evidence; 2) the trial court erred in allowing the prosecutor to ask the defendant why he had not earlier provided the alibi that he offered at trial to law enforcement officials; 3) the trial court erred in applying enhancement factor (6) to enhance the sentence for his aggravated robbery conviction; and 4) that the trial court erred in ordering that he serve his aggravated robbery sentence consecutively to his life sentence. Based upon our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID H. WELLES, J., and CORNELIA A. CLARK, SP.J., joined.

Edward E. DeWerff, Clarksville, Tennessee, for the appellant, Daronopolis R. Sweatt.

Paul G. Summers, Attorney General and Reporter; Lucian D. Geise, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Helen O. Young, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant, Daronopolis Sweatt, was convicted of first degree felony murder and aggravated robbery for a homicide and a robbery committed in Clarksville, Tennessee. The defendant received a life sentence for the murder conviction and a consecutive eleven-year sentence for the aggravated robbery conviction. The defendant timely appealed to this court, presenting the following issues for review:

I.     Whether the State established venue by a preponderance of the evidence;

II.    Whether the trial court erred in allowing the prosecutor to ask, during cross-examination of the defendant, why the defendant did not provide his alibi to law enforcement officials during the twenty-three months that he was in pretrial confinement;

III.   Whether the trial judge erred in applying enhancement factor (6) in sentencing the defendant for his aggravated robbery conviction; and

IV.    Whether the trial court erred in ordering the aggravated robbery sentence to run consecutively to the life sentence.

After a thorough review of the record and of applicable law, we affirm the judgments of the trial court.

## FACTS

On May 18, 1997, at approximately 6:08 a.m., thirty-one-year-old Sylvester Cage, Jr., was robbed and shot to death outside a barber shop in Clarksville, Tennessee. The victim, a Kentucky resident who frequently traveled to Clarksville to gamble, spent the evening of May 17, and the early morning hours of May 18, playing dice at the Ninth Street Barber Shop. The victim left the barber shop when the dice game ended at 6:00 a.m., and crossed the street to a pay phone outside the Butcher Shop, a business directly across the street from the barber shop, where he placed a call to his wife. There, the victim was approached by a masked man with a nine millimeter handgun, who shot the victim six times. As the victim lay dying, the gunman took a rubber-band wrapped wad of $1,000 to $2,000 in cash, representing gambling winnings, from the victim's pocket. The gunman then fled on foot. The defendant was subsequently arrested for the crime, and charged with one count of felony murder and one count of especially aggravated robbery.

At trial, the victim's wife testified that the victim went to Clarksville on the evening of May 17, 1997, to gamble. She said that the victim called her at exactly 6:07 the next morning, May 18, to tell her that he was about to start for home.

Bobby Ramey, an acquaintance of both the defendant and the victim, testified that the victim had had a reputation for gambling, and was known to carry large amounts of cash on his person. Ramey said that he and the defendant passed the victim on the street approximately one week before the victim was killed, and that when the defendant saw the victim, he told Ramey that, if he got the chance, he intended to rob the victim.

Raymond Ogburn, a friend of the victim, testified that he and three or four other men, including the victim, spent the evening of May 17, and the early morning hours of May 18, playing dice at the Ninth Street Barber Shop. Ogburn stated that the barber shop was located at the corner of Ninth and Main Streets in Clarksville. He said that when the dice game broke up at about 6:00 a.m., the victim wrapped a rubber band around his "wad of money," and left with fellow gambler George Hoosier. A few minutes later, Ogburn heard "a lot of gunshots." Ogburn looked out the window and saw a tall, slim, black man, who was wearing a rubber face mask and holding a gun, standing over the victim's body "in his pocket getting his money out." As Ogburn watched, the gunman fled across a parking lot between the Butcher Shop and the auto parts store next to it, and disappeared from view. Ogburn went outside to the street with his cordless phone, and placed a 911 call. Records indicated that this 911 call was received at 6:09 a.m. Ogburn testified that approximately thirty seconds after the gunman fled, Hoosier drove up in his pickup truck. Ogburn pointed out which direction the gunman had gone, and Hoosier drove off in pursuit.

George Hoosier testified that, as he was driving away from the barber shop on the morning of May 18, 1997, he heard gunshots, looked in his rearview mirror, and saw someone pointing a gun at the victim, and the victim falling to the ground. Hoosier turned his truck around and drove back to the barber shop, where Ogburn told him which way the gunman had fled. As Hoosier searched the area, he spotted the defendant, whom he knew and recognized, running down an alley. Driving down a street that runs parallel to the alley, Hoosier was able to track the defendant's flight for a couple of blocks, but eventually lost sight of him.

Sabrina Hester, who worked for Catholic Charities of Tennessee which was located near the same alley down which Hoosier had seen the defendant run, testified that on May 22, 1997, she found a rubber face mask under a large rock in the corner of the church building's outdoor picnic area.

Chantel Jenkins, the defendant's ex-girlfriend, testified that the defendant appeared at her apartment at 526 Main Street very early on the morning of May 18, 1997, asking that she call him a cab. Jenkins stated that she thought the defendant had shown up at her apartment between 5:30 and 6:00 a.m., but admitted that she was not certain of the actual time. She said that the defendant stayed in her apartment about five to ten minutes before the cab arrived to pick him up.

Dean Mead, a Veteran's Cab Company taxicab driver, testified that at 6:18 or 6:20 on the morning of May 18, 1997, he was dispatched to pick up a fare at 526 Main Street. Mead said that as he drove toward the apartment building, he was forced to detour around an area that the police had blocked. When he reached 526 Main Street, the defendant, whom Mead recognized as someone he had picked up several times in the past, got into the front seat of his cab. Mead said that he apologized to the defendant for having taken a couple of extra minutes to reach him, and that the defendant told him it was "no problem," and mentioned that there had just been a shooting in the neighborhood. Mead testified that the defendant paid him with a $10 bill, which he took out of a large, rubber band wrapped roll of money from his pocket.

At the conclusion of the State's case in chief, the defendant made a motion to dismiss for failure to establish venue. The trial court denied the motion, finding that numerous State witnesses had, through their testimony, established that the crime occurred in Clarksville, Tennessee.

The defendant testified in his own defense. He stated that he spent the late evening and early morning hours of May 17 and 18, 1997, driving around town, in a car he stole from his mother, selling crack cocaine and smoking marijuana. He said that, sometime between 5:00 and 5:30 a.m, he drove to Chantel Jenkins' apartment building, because he hoped that she would agree to have sexual intercourse with him. He parked the car in the apartment building's parking lot and, as he turned the engine off, broke the key in the ignition. The defendant testified that he then sat in the car, smoking more marijuana and trying, unsuccessfully, to extract the broken key from the car's ignition, before finally going up to Jenkins' apartment.

The defendant stated that he looked at a clock as Jenkins let him into her apartment, and saw that it was between 5:55 and 6:00. On cross-examination, the defendant narrowed the time to exactly 5:59 a. m. The defendant testified that he decided to leave the apartment, and asked Jenkins to call him a cab, when he realized that she already had a man in her bed. The defendant said that he spent approximately thirty minutes in Jenkins' apartment before the cab arrived.

The defendant stated that soon after the cab driver began to drive him home, a police officer pulled the cab over to the side of the road. The officer directed the defendant to get out of the cab, and, after patting him down, told him that he was being held as a suspect. The defendant said that the police officer, however, did not tell him what he was suspected of doing, and that "when he said suspect, I'm thinking about the drugs that I had in my drawers and I broke and ran."

The defendant denied that he had told Bobby Ramey that he intended to rob the victim, and stated that he had not robbed and killed the victim.

The State presented the rebuttal testimony of Officer Michael Thornton of the Clarksville Police Department. Thornton testified that, at approximately 6:25 a.m. on May 18, 1997, while canvassing the area in which the suspect was reported to have fled, he came across and stopped Mead's cab. When he learned that Mead had picked the defendant up at 526 Main Street, which was only three and a half blocks from the crime scene, Thornton asked the defendant to step out of the cab. As Thornton patted the defendant down, he "observed a large wad of money folded half over with a rubbery band wrapped around it" in the right rear pocket of the defendant's shorts. Thornton then told the defendant that he was placing him in investigatory detention, because there had been a shooting just a few blocks away. At that point, the defendant pulled away from Thornton, and fled on foot. Thornton was unable to apprehend him.

-4-

After deliberation, the jury found the defendant guilty of first degree felony murder and aggravated robbery.[1]  The trial court gave the defendant a life sentence for the first degree murder conviction.  At the sentencing hearing on the defendant's aggravated robbery conviction, the trial court found two enhancement factors to be applicable under Tennessee Code Annotated Section 40-35-114:  (1) the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; and (6) the personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great.  The trial court found no applicable mitigating factors.  Accordingly, the trial court sentenced the defendant to eleven years in confinement.  Finding that the defendant met the criteria of Tennessee Code Annotated Section 40-35-115(b)(4), as a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime when the risk to human life was high, the trial court ordered that the defendant serve his aggravated robbery sentence consecutively to his life sentence.

## ANALYSIS

### I.  Venue

The defendant argues that the State failed to prove venue by a preponderance of the evidence because "at no time during the State's case in chief did any State's witnesses testify that the robbery and murder of Sylvester Cage occurred in Montgomery County, Tennessee."  The defendant argues, therefore, that the convictions must be vacated and the case remanded for a new trial.

The State argues that it met its burden of proving venue by presenting the uncontradicted testimony of numerous witnesses who stated that the offenses occurred in Clarksville, Tennessee. The State asserts that the jurors, all of whom were residents of Clarksville, Montgomery County, Tennessee, could logically infer that if the offenses occurred in Clarksville, they occurred in Montgomery County.

As provided by article I, section 9, of the Tennessee Constitution, a defendant in a criminal case has the right to be tried by an impartial jury of the county in which the crime was committed. Tenn. Const. art. I, § 9; see also Tenn. R. Crim. P. 18; State v. Anderson, 985 S.W.2d 9, 15 (Tenn. Crim. App. 1997).  Proof of venue is necessary to establish the court's jurisdiction.  See Harvey v. State, 213 Tenn. 608, 612, 376 S.W.2d 497, 498 (1964); Hopson v. State, 201 Tenn. 337, 299 S.W.2d 11, 14 (1957).  Since venue is not an element of the crime, the State need only prove by a preponderance of the evidence that the charged offense was committed in the county in which the defendant is being tried.  State v. Bennett, 549 S.W.2d 949, 949-50 (Tenn. 1977); Anderson, 985 S.W.2d at 15; see Tenn. Code Ann. § 39-11-201(e) (1997). Venue may be proved by circumstantial

---

[1]The trial court found that the State had failed to prove an essential element of the crime of especially aggravated robbery, that the victim suffered "serious bodily injury," because, under Tennessee case law, the victim's death, alone, does not equate to serious bodily injury.  Consequently, the trial court instructed the jury that it was dismissing the especially aggravated robbery charge against the defendant, but that the jury was free to find the defendant guilty of the lesser-included crimes of aggravated robbery or robbery.

evidence, and even slight evidence is sufficient if it is uncontradicted. Bennett, 549 S.W.2d at 949-50. Finally, a jury is entitled to draw reasonable inferences from proven facts to establish venue. Id.; Hopson, 299 S.W.2d at 14.

In this case, several State witnesses testified that the robbery and murder of the victim occurred outside the Ninth Street Barber Shop in Clarksville, Tennessee. From this uncontradicted testimony, the jury could reasonably infer that the offenses occurred in Montgomery County. See State v. Chris Smith, No. 03C01-9807-CR-00259, 1999 WL 619042, at * 2 (Tenn. Crim. App. Aug. 17, 1999) (holding that State met its burden of proving venue in McMinn County by proof that offenses occurred in Athens because "jury could properly determine that Athens is in McMinn County"); State v. Marbury, 908 S.W.2d 405, 408 (Tenn. Crim. App. 1995) (holding that police officer's testimony that DUI arrest occurred when he was running radar while on duty as Somerville police officer sufficient to establish venue in Fayette County). We conclude, therefore, that the State met its burden of proving venue in Montgomery County by a preponderance of the evidence.

## II. Cross-Examination of Defendant Regarding his Pretrial Silence

The defendant argues that the trial court committed reversible error by allowing the State to ask him why he had not provided the same account of his whereabouts that he offered at trial to law enforcement officials during the twenty-three months he spent in pretrial confinement. During the State's cross-examination of the defendant, the following exchange took place:

> Q. And in all this twenty-three months that you have been sitting in jail, did you ever once tell any law enforcement official where you were that night?
>
> A. I talked to a couple of them, I told them I was hustling and I went over to my girlfriend's house.
>
> Q. You told police officers that?
>
> A. Yeah I didn't–yeah, we talked about it sometime. We talked–I talked to the police officers before the trial just happened to start up.
>
> Q. You are talking about this case, during the course of the investigation, did you ever talk to Detective Cheryl Anderson?
>
> A. No.

MR. DEWERFF[2]:     Your Honor, may we approach please?

THE COURT:     Yes.

(WHEREUPON, a bench conference was had between Court and Counsel, the same being within the presence but outside the hearing of the jury as follows:)

MR. DEWERFF:     I believe this is an improper cross examination of the defendant's right to remain silent.

THE COURT:     Based on what, Mr. Dewerff?

MR. DEWERFF:     That he doesn't have to make a statement, your Honor.

THE COURT:     The objection is overruled.

(WHEREUPON, end of bench conference.)

THE COURT:     Go ahead, please.

Q. (By General Young) When you turned yourself in on the 19th, Mr. Sweatt, it was Detective Anderson that booked you–

A. Yes ma'am.

Q. –took your fingerprints?

A. Yes ma'am.

Q. Took the information for the intake sheet?

A. Yes ma'am.

Q. At that time, did you tell her where you had been the night before?

A. No ma'am, we did not–she asked me did I want to talk to her and I told her no.

---

[2]The State has drawn our attention to the fact that the defendant's lawyer's name is misspelled as "DeWerf" throughout the transcript of the trial. We, therefore, have corrected the spelling in this opinion.

Q. And you knew what you were charged with?

A. Yes ma'am.

Q. You were charged with first degree murder?

A. Yes ma'am.

Q. And instead of telling her where you were while there were still people around that might have known, you sat on it for two years?

A. Well, I am just going to tell you, I was advised when I was coming down here not to talk to nobody until I talked to a lawyer.

The defendant argues that this line of questioning by the State amounted to an impermissible comment upon his Fifth Amendment right to remain silent. The defendant further argues that the error was not harmless because the State's questioning cast doubt upon his credibility, which was crucial to his defense.

The State argues that the line of questioning it employed was not an improper comment upon the defendant's right to remain silent, but instead was a valid impeachment of the defendant's statement that he had "talked to a couple [of police officers]" and told them that he was "hustling" and had gone over to his girlfriend's house. The State asserts that, by taking the stand, the defendant opened himself up to impeachment by any prior inconsistent statements he may have made, or by any prior inconsistent actions that he may have taken. The State also argues that, even if the questions were improper, they constituted harmless error.

It is well established that a defendant may not be penalized at trial for the exercise of his constitutional right to remain silent after arrest. Doyle v. Ohio, 426 U.S. 610, 618, 96 S. Ct. 2240, 2245, 49 L. Ed. 2d 91 (1976); Braden v. State, 534 S.W.2d 657, 661 (Tenn. 1976); State v. Mabe, 655 S.W.2d 203, 205 (Tenn. Crim. App. 1983). Thus, the prosecution should neither comment on a defendant's post-arrest silence, nor use it to impeach a defendant's testimony during trial. Braden, 534 S.W.2d at 660; Mabe, 655 S.W.2d at 205; Ware v. State, 565 S.W.2d 906, 908 (Tenn. Crim. App. 1978); Honeycutt v. State, 544 S.W.2d 912, 917 (Tenn. Crim. App. 1976). However, evidence of the defendant's pretrial silence may be admitted, with caution, in those instances in which the defendant's silence is patently inconsistent with his testimony at trial. Braden, 534 S.W.2d at 660; Ware, 565 S.W.2d at 908; Kelley v. State, 478 S.W.2d 73, 75 (Tenn. Crim. App.), cert. denied (Tenn. 1972) (holding that cross-examination of defendants regarding their pretrial silence was proper, since defendants' testimony at trial that they were attempting to inform police of a burglary and to return stolen property at the time of their arrest contrasted with their refusal to make statements to the police or to allow police to search their vehicles). "Where a defendant testifies to an exculpatory version of events and claims to have told the police the same version of events upon arrest, then his post-arrest silence can be used to contradict him." Ware, 565 S.W.2d at 908.

On direct examination, the defendant made no mention of having given law enforcement officers the same account of his whereabouts that he offered at trial. The prosecutor's initial question of whether the defendant had "ever once" told the story to any law enforcement officials during the months he was in pretrial confinement, therefore, was improper. We also find the last question improper, in which the prosecutor referred to the defendant having "sat on" the alibi information for two years. See Braden, 534 S.W.2d at 660. We note, however, that defense counsel did not immediately object to the initial question, and that the defendant, by responding with testimony indicating that he had, after his arrest, given police officers the same alibi that he offered at trial, opened himself up to much of the State's subsequent questioning. See Braden, 534 S.W.2d at 660; Ware, 565 S.W.2d at 908. These subsequent questions, which primarily attempted to elicit whether the defendant had told the story to the police detective who interviewed and booked him when he turned himself in, were clearly designed to impeach the defendant's claim that he had given the same alibi to police that he had just offered at trial.

In a recent case, State v. Terry Lucas, No. 01C01-9811-CC-00458, 2000 WL 19537 (Tenn. Crim. App. Jan. 13, 2000), this court found that the improper comment upon the defendant's right to remain silent made by one of the State's witnesses did not rise to the level of reversible error when, *inter alia*: there was no indication that the prosecutor intentionally elicited the comment in order to create an inference of the defendant's guilt; it did not appear that the comment, when viewed in context, would necessarily cause the jury to draw an inference of the defendant's guilt; and the prosecutor made no reference to the defendant's pretrial silence during closing arguments. Id. at *4.

In Momon v. State, 18 S.W.3d 152, 163-65 (Tenn. 1999), our supreme court recognized the applications of the harmless error doctrine to constitutional violations, in both the federal courts, Chapman v. California, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), and the Tennessee courts, including situations in which the prosecutor improperly commented upon the defendant's privilege against self-incrimination. State v. Transou, 928 S.W.2d 949, 960 (Tenn. Crim. App. 1996) (holding that prosecutor's improper comment upon the defendant's right against self-incrimination and right to remain silent during the trial, made in argument, was harmless error). Applying such an analysis to the instant case, we find that the improper questions of the prosecutor were harmless error.

During her closing argument, the prosecutor made no reference to the defendant's pretrial silence regarding the alibi.[3] We also note that the entire exchange at issue comprised only a small portion of the prosecutor's cross-examination of the defendant, and that there was no indication that the prosecutor's questions were deliberately intended to lead the jury to infer the defendant's guilt from his pretrial silence. In its case in chief, the State made out a strong case against the defendant, presenting substantial evidence from which the jury could determine that the defendant was guilty of the offenses charged. Viewing the record as a whole, we cannot find that the State's improper reference to the defendant's pretrial silence, made in one brief exchange during a fairly lengthy trial,

---

[3]In Braden, the court concluded that the prejudice to the defendants resulted not from the brief improper question regarding the defendants' pretrial silence but from the jury arguments of the State regarding that silence. 534 S.W.2d at 660.

had a prejudicial effect upon the jury's verdict. We conclude, therefore, that these comments constituted harmless error.

### III. Use of Enhancement Factor (6)

The defendant next argues that the trial court erred in applying enhancement factor (6), "the personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great," to enhance his aggravated robbery sentence. The defendant asserts that it was error for the trial court to apply this enhancement factor because the death of the victim, upon which the trial court relied to find the enhancement factor applicable, "is an element of the offense of first degree murder." The State argues that the record supports the trial court's use of this enhancement factor.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The weight to be afforded an enhancement or a mitigating factor is left to the trial court's discretion as long as the trial court complies with the purposes and principles of the 1989 Sentencing Act, and its findings are adequately supported by the record. Tenn. Code Ann. § 40-35-210 (1997), Sentencing Commission Cmts.; State v. Moss, 727 S.W.2d 229, 236 (Tenn. 1986).

The applicability of a particular enhancement factor must be determined on a case by case basis. State v. Lavender, 967 S.W.2d 803, 807 (Tenn. 1998). The same facts used to establish an element of the charged offense may not be relied upon to find an enhancement factor applicable for increasing the defendant's sentence for that offense. Id. (citing State v. Jones, 883 S.W.2d 597, 601 (Tenn. 1994)). The burden to show the erroneous application of a sentencing enhancement factor rests upon the defendant, as the party challenging the sentence imposed by the trial court. See Sentencing Commission Cmts. to Tenn. Code Ann. § 40-35-401; Ashby, 823 S.W.2d at 169; State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994).

The defendant argues that the trial court erred in applying enhancement factor (6) because the death of the victim, the fact upon which the trial court relied to find enhancement factor (6) applicable, was an essential element of the crime of first degree murder. However, the trial court applied enhancement factor (6) not to the defendant's sentence for first degree murder, but to the defendant's sentence for aggravated robbery. The relevant inquiry, therefore, is whether the same facts upon which the trial court relied to find factor (6) applicable were necessary to establish an element of the defendant's crime of aggravated robbery. Aggravated robbery is defined in Tennessee Code Annotated Section 39-13-402:

-10-

(a) Aggravated robbery is robbery as defined in § 39-13-401:[4]

> (1) Accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon; *or*

> (2) Where the victim suffers serious bodily injury.

> . . . .

Tenn. Code Ann. § 39-13-402 (1997) (emphasis added). Thus, a defendant can be convicted of aggravated robbery if the facts show *either* that the defendant used or displayed a deadly weapon, *or* that the victim suffered serious bodily injury. Especially aggravated robbery, by contrast, requires *both* that the defendant used a deadly weapon *and* that the victim suffered serious bodily injury. Compare Tenn. Code Ann. § 39-13-402 with Tenn. Code Ann. § 39-13-403 (1997).

In this case, the trial court dismissed the especially aggravated robbery charge against the defendant, finding that the evidence did not support a finding that the victim suffered "serious bodily injury," as that term is defined by statute and case law. The defendant's conviction for aggravated robbery, therefore, must have been based solely on subsection (1) of Tennessee Code Annotated Section 39-13-402, the defendant's use of a deadly weapon.

The trial court found factor (6) applicable to enhance the defendant's sentence for aggravated robbery because the personal injuries inflicted upon the defendant were particularly great. This is a different fact from that relied upon, the defendant's use of a deadly weapon, to establish an element of the crime. In discussing the applicability of factor (6), the court stated:

> Next the State argues that the personal injuries inflicted upon the defendant–excuse me upon the victim were particularly great. The Court finds that that is a factor that should apply. Aggravated robbery does not contemplate that anyone will necessarily be injured, and, so, the Court will apply that and give it the weight to which it is entitled.

The trial court's finding in this matter is supported by the record. The evidence showed that the defendant shot the victim six times with a nine millimeter handgun, striking him in the leg, chest, abdomen, and arm. The victim died as a direct result of the gunshot wounds to his chest and abdomen. We conclude, therefore, that the trial court did not err by its use of sentencing enhancement factor (6) to enhance the defendant's sentence for aggravated robbery. See State v. Eric DeWayne McElmore, No. 03C01-9802-CR-00056, 1999 WL 301489, at *3 (Tenn. Crim. App. May 14, 1999),

---

[4]Tennessee Code Annotated Section 39-13-401 defines robbery as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. Section 39-13-401 (1997).

perm. app. denied (Tenn. Nov. 22, 1999) (holding that enhancement factor (6) improperly applied because no proof in record as to the seriousness of the victim's wound).

## IV. Consecutive Sentencing

The defendant argues that the trial court erred in ordering that his aggravated robbery sentence of eleven years be served consecutively to his life sentence for first degree murder. The defendant contends that the trial court failed to make the additional findings necessary to impose consecutive sentencing upon a defendant who is classified as a dangerous offender, that the aggregate length of the sentences was reasonably related to the severity of the offenses, and that consecutive sentencing was necessary in order to protect the public from further criminal conduct by the defendant. The State acknowledges that the trial court failed to make these specific findings, but argues that the record supports the trial court's imposition of consecutive sentencing.

Tennessee Code Annotated Section 40-35-115 provides that the trial court may, in its discretion, impose consecutive sentencing on a defendant convicted of multiple offenses if it finds that the defendant falls into any one of several different categories, among which is subsection (b)(4), "The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high[.]" Tenn. Code Ann. § 40-35-115(b)(4) (1997). If the trial court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, however, it is required to make further findings that the defendant's sentence reasonably relates to the severity of his offenses, and is necessary to protect the public from further criminal conduct of the defendant. State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995). Since the trial court failed to make these findings, we review this issue *de novo*, with no presumption of correctness given to the trial court's decision.

Our review of the record leads us to conclude that the trial court properly imposed consecutive sentencing upon the defendant in this case. The circumstances of the defendant's crime, in shooting the victim six times, and then robbing him as he lay dying in the street, clearly justifies the trial court's classification of the defendant as a dangerous offender. These same facts support a finding that consecutive sentencing is reasonably related to the severity of the defendant's offenses, and is necessary to protect the public from further criminal activity of the defendant.

## CONCLUSION

We conclude that the State established venue by a preponderance of the evidence, and that the State's improper questions regarding the defendant's pretrial silence did not constitute reversible error. We further conclude that the trial court did not err in applying sentencing enhancement factor (6) to the defendant's aggravated robbery conviction, and that the record supports the trial court's imposition of consecutive sentencing. Accordingly, we affirm the judgment of convictions, and the length and manner of sentencing imposed.

_____

ALAN E. GLENN, JUDGE